COMMONWEALTH OF PUERTO RICO, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, PONCE PART, ANTONIO J. MATTA, JUDGE, Respondent; PEDRO ÁNGEL TORRES, Intervener.

No. C-65-39.     Decided June 14, 1967.

688

*J. B. Fernández Badillo, Solicitor General,* and *Peter Ortiz, Assistant Solicitor General,* for petitioner. *Enrique Corchado Juarbe* for intervener.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

In an action for nullity of confiscation of a motor vehicle filed by Pedro Ángel Torres against the Commonwealth of Puerto Rico, the Superior Court of Puerto Rico made the following findings of fact:

"2.) On and before September 24, 1963 plaintiff was the owner of a motor vehicle, a GMC Panel Delivery, license No. C336-371 which was confiscated on said date because on the 22nd of that month it was used to bear, transport, carry, and transfer material of the illegal game of the bolita.

"3.) The vehicle in question has been used since 1961 by Nicolás Ortiz, under a lease contract with plaintiff for a weekly rental of $40. Ortiz is the owner of a bakery in Coamo since 1958 and has used the vehicle to sell and distribute bread. According to the terms of the contract, Ortiz was bound to furnish and pay the driver for the vehicle and had complete supervision thereof. The cost for tires, gasoline, and repairs was assumed by Ortiz.

"4.) Ortiz' bakery is situated on No. 9 Dr. Veve Street, Coamo. On September 1963 the driver of the leased vehicle was Federico Rodríguez Zayas, who received one cent for each pound of bread sold. Rodríguez in turn sold Ortiz' bread in the towns of Villalba and Orocovis and their barrios. The business between

Rodríguez and Ortiz began in 1958. When Rodríguez was unable to come, another person sent by him drove the pickup. It was his practice to load the pickup and take it at night to Rodríguez' house to facilitate the early sale on the following day. On September 22, 1963 the pickup was driven by Rodríguez to sell bread in Orocovis and Villalba.

"5.) In the afternoon of September 22, members of the police force were going in the private car of police Carlos J. Torres, of Villalba, towards a place known as Los Pinos. They saw the pickup No. C336-371 parked almost in the middle of the road. The police, among them José Ríos, knew Rodríguez and knew that he was engaged in the sale of bread. When they saw the vehicle they stopped behind it and went to see what was the matter. When Rodríguez saw Ríos he recognized him and went on his way throwing some papers to the ground which upon being picked up by the police appeared to be a list of numbers of the bolita game.

"6.) Plaintiff leased his pickup to Ortiz for the sale of bread exclusively. Ortiz in turn permitted Rodríguez to use it for the sale of bread and had forbidden him to use it for any other purpose. He never had knowledge nor information that Rodríguez was engaged also in the bolita game or that he used the vehicle for that purpose."

.        .        .        .        .        .        .        .

"In the light of these facts [the trial court concluded] it may be reasonably inferred that the case falls under the exception which is recognized to protect the right of a third innocent. Ochoteco v. Superior Court, C-63-1, decided June 5, 1963." Consequently, said court entered judgment granting the complaint and ordering the return of the vehicle confiscated, or in default thereof, to pay plaintiff its value of $1,800.

We issued a writ of certiorari to review said judgment.

■   The opinion of the majority of this Court is to the effect that the rule still prevailing as to the propriety of confiscations when the rights of third parties are involved, is that enunciated in the case of *General Motors Acceptance*

v. *Brañuela*, 61 P.R.R. 701 (1943). It was so established in the separate opinion of Mr. Justice Blanco Lugo in *Meléndez* v. *Superior Court*, 90 P.R.R. 639, 659 (1964). Thus, in this jurisdiction the prevailing doctrine is that the confiscation proceeding is directed against the vehicle itself and not against its owners, and that consequently, the rights that upon said vehicle could be had by innocent third parties are not protected except in those cases in which it is proved that the possession of the vehicle has been obtained by the violator without the express or implied consent of the owner or of third innocent parties, as happens when the vehicle has been stolen, and if the owner or third innocent party directly or indirectly has placed the vehicle in the possession of the violator or of the person under whose orders he acts, the rights of the owner or of the third innocent party, under such circumstances, run the risk that goes along with whatever use to which the one in possession dedicates the vehicle.

■ It was recently decided in *Plymouth Sedan* v. *Pennsylvania*, 380 U.S. 693 (1965), that since the purpose of the confiscation proceeding was to punish for the commission of a public offense, said proceeding has a punitive character and is of a quasi-criminal nature, and therefore, evidence obtained in violation of constitutional guarantees is not admissible in said proceeding to establish the commission of the offense which gives rise to the violation. However, in said case the rule concerning the rights of third innocents is not discussed. If we seek to assimilate criteria of criminal intention in the case of third parties, we would be granting a blanket immunity to offenders of the law who by means of a clever strategy would be in condition to violate it by employing vehicles belonging to others without the risk of confiscation. Furthermore, it would lead to the untenable position that the third party (owner of the vehicle) would have blanket immunity if within the proceeding of confiscation it

would be necessary to establish his criminal liability within a public offense committed by another person.

■■■ The trial court erred in applying to this case the ruling of *Ochoteco, supra.* The *Ochoteco* case fell within the exception indicated in *Brañuela,* since the facts stipulated therein allowed the conclusion that the violator had committed the offense of larceny of use. The situation of facts is different in this case. The offender, Rodríguez, was an agent or employee of the lessee of the confiscated vehicle. He committed criminal acts while he conducted the vehicle to sell bread in Orocovis and Villalba. The place where he committed the offense was on his route. The possession of the vehicle by Rodríguez was at that time authorized by the lessee of the vehicle. There is no basis to conclude that Rodríguez had committed the offense of larceny of use of the vehicle at the time of violating the Bolita Act. Nor is the third party protected by the fact that Ortiz had prohibited Rodríguez to use the vehicle for other purposes, nor the fact that he was not aware that Rodríguez used the vehicle in connection with the prohibited game of bolita,[1] since the unauthorized use of a vehicle by an employee does not protect the owner of the vehicle. *Metro Taxicabs* v. *Treasurer,* 73 P.R.R. 164 (1952).

The intervener argues that the facts of this case allow the conclusion that Rodríguez committed the offense of embezzlement established in § 450 of the Penal Code (33 L.P.R.A. § 1726).

■■■ We do not agree even when the commission of said offense constitutes another exception to the *Brañuela* rule. The Spanish version of said section provides: "*Todo dependiente, agente o sirviente de alguna persona, que frau-*

---

[1] The question of whether the vehicle was seized while it was being used in connection with the bolita game is not in issue in this case. It all tends to indicate that its driver also used it to sell bolita numbers.

*dulentamente empleare en su propia utilidad, u ocultare con fraudulenta intención de apropiárselos, cualesquiera bienes confiados a su custodia en virtud de su empleo como tal dependiente, agente o sirviente, será culpable de abuso de confianza."\**

Relying on the preceding language the intervener maintains that Rodríguez employed the vehicle for his own benefit by transporting therein the list of numbers of bolita without the authorization or knowledge of the intervener, for which reason Rodríguez committed the offense of embezzlement and that it establishes an exception to the *Brañuela* rule. The English text of said section, which is the prevailing version,[2] gives a clearer idea of the meaning of the phrase, *"que fraudulentamente empleare en su propia utilidad."* In English the phrase used is "who fraudulently appropriates to his own use."[3] This means that the clerk, agent or servant, should fraudulently appropriate to himself the use of the property entrusted to his custody by virtue of the employment as such clerk, agent or servant, in order to commit the offense of embezzlement. That is to say, what really constitutes this offense is that there has been a conversion of the property by virtue of which the clerk, agent or servant appropriates it to himself. See *Blanco* v. *People*, 25 P.R.R. 670 (1917); *People* v. *Calderón*, 18 P.R.R. 568 (1912).

In this case Rodríguez did not appropriate to himself for his own benefit the vehicle confiscated. It cannot be main-

---

\* See note 3.

[2] *People* v. *Palóu*, 80 P.R.R. 351, 356 (1958); *People* v. *Belardo*, 50 P.R.R. 491 (1936); *People* v. *Pelliccia*, 53 P.R.R. 563 (1938).

[3] The whole text reads as follows:

"Every clerk, agent, or servant of any person who fraudulently appropriates to his own use, or secretes with a fraudulent intent to appropriate to his own use, any property of another which has come into his control or care by virtue of his employment as such clerk, agent, or servant is guilty of embezzlement." (33 L.P.R.A. § 1726.)

tained, therefore, that he committed the offense of embezzlement provided in § 450 of the Penal Code.

The judgment entered by the Superior Court will be reversed and another entered dismissing the complaint.

Mr. Chief Justice Negrón Fernández did not participate herein. Mr. Justice Belaval, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra dissented in separate opinions.

—O—

Mr. Justice Santana Becerra, with whom Mr. Justice Belaval concurs, dissenting.

San Juan, Puerto Rico, June 14, 1967

After the decision of the Supreme Court of the United States of April 29, 1965, *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U.S. 693, 696–702, I do not believe that those standards which considered the nature of the confiscation as a mere civil proceeding directed against the thing can still prevail here. The cited case clearly states the criminal nature of the confiscation and which entails punishment for the commission of the offense. Consequently, it is imperative that these cases be decided with a view to the basic constitutional guarantees and the law which protect the citizen accused in criminal proceedings.

Act No. 220 of 1948 authorizes the forfeiture of vehicles "used in connection with prohibited games . . . that have been seized in connection with said games." The evidence in this case does not prove, within the degree of legal sufficiency required by the due process of law and a fair verdict in criminal proceedings which entail punishments for the commission of the offense, that the vehicle in this case was thus used or seized within the interpretation and meaning given to these phrases compatible with the protection of an innocent

party against punishment. It was rather proved that it was a licit use in the ordinary course of business, even when it was revealed that a driver was carrying a list of the game. Within the normative situation of the present case, as reaffirmed and sanctioned unanimously by a Supreme Court in the cited *Plymouth Sedan* case, under the circumstances of fact of this case an innocent is being punished. For the reasons stated, I do not concur with the opinion of the majority.

—O—

MR. JUSTICE BELAVAL, with whom MR. JUSTICE HERNÁNDEZ MATOS and MR. JUSTICE SANTANA BECERRA agree, dissenting.

San Juan, Puerto Rico, June 14, 1967

On September 24, 1963 the intervener Pedro Ángel Torres was owner of a motor vehicle, a GMC Panel Delivery, license No. C-336-371; since 1961 the vehicle had been leased by the intervener to Nicolás Ortiz to be used in the bakery business which since 1958 was owned by said Nicolás Ortiz in the city of Coamo. According to the terms of the lease contract, Ortiz had agreed to appoint, pay and supervise the driver of the motor vehicle object of the lease. Since 1958, that is, since the beginning of his bakery business, the lessee Ortiz appointed as driver of the leased vehicle Federico Rodríguez Zayas, to whom he paid one cent for each pound of bread sold in the cities of Villalba, Orocovis and their barrios. It was the practice to load the pickup in the establishment of Ortiz, and after being loaded to take it at night to the house of Rodríguez in order that he could go out early in the following morning to sell bread. As it was customary, on September 22, 1963 the pickup left driven by Rodríguez to sell bread in Orocovis and Villalba. Certain police officers saw the pickup parked in the middle of the road

and stopped behind the pickup in order to see what was wrong. When the driver Rodríguez saw the police he kept on his way and threw a piece of paper to the ground, which upon being picked up by the police it was found to be a list of bolita numbers. Neither the owner of the vehicle Pedro Ángel Torres, nor the lessee of the same vehicle, Nicolás Ortiz, knew that the driver of the vehicle, Federico Rodríguez Zayas, was engaged in the bolita game; nor that he had been authorized to carry any bolita material in the vehicle devoted to the bakery business of the lessee. The vehicle of the intervener Pedro Ángel Torres was confiscated by the Commonwealth of Puerto Rico. The annulment of the confiscation was sought and the Ponce Part of the Superior Court of Puerto Rico ordered the return of the vehicle because the owner of the vehicle was an innocent party in the illegal use of said vehicle.

The writ of certiorari having been issued to review said decision, the opinion of the majority of this Court reverses the same on the following ground: "The opinion of the majority of this Court is to the effect that the rule still prevailing as to the propriety of confiscations when the rights of third parties are involved, is that enunciated in the case of *General Motors Acceptance* v. *Brañuela*, 61 P.R.R. 701 (1943). It was so established in the separate opinion of Mr. Justice Blanco Lugo in *Meléndez* v. *Superior Court*, 90 P.R.R. 639, 659 (1964). Thus, in this jurisdiction the prevailing doctrine is that the confiscation proceeding is directed against the vehicle itself and not against its owners, and that consequently, the rights that upon said vehicle could be had by innocent third parties are not protected except in those cases in which it is proved that the possession of the vehicle has been obtained by the violator without the express or implied consent of the owner or of third innocent parties, as happens when the vehicle has been stolen, and if the owner or third innocent party directly or indirectly

has placed the vehicle in the possession of the violator or of the person under whose orders he acts, the rights of the owner or of the third innocent party, under such circumstances, run the risk that goes along with whatever use to which the one in possession dedicates the vehicle."

Let us see again if the statements of the majority opinion in connection with the *Brañuela* case are correct: *General Motors Acceptance* v. *Brañuela*, 60 P.R.R. 680, 683 (De Jesús) (1942), and *General Motors Acceptance* v. *Brañuela*, on reconsideration, 61 P.R.R. 701, 705 (De Jesús) (1943).

The first opinion set out the following facts: Caribe Motors Corporation conditionally sold to Petra Brañuela a Chevrolet automobile which was afterwards seized by the Treasurer of Puerto Rico on the ground that it had been used by Juan Reyes Matías, a chauffeur, in transporting 35 gallons of alcohol in violation of the "Spirits and Alcoholic Beverages Act" approved June 30, 1936 (Sp. Sess. Laws, p. 44). The appellant (General Motors Acceptance), to whom Caribe Motors Corporation had assigned its rights in the conditional sale contract, filed a petition in the lower court for repossession against Petra Brañuela and the Treasurer, pursuant to the provisions of the Act concerning Conditional Sales of Personal Property and Chattels. The appellant alleged the execution of the contract between Caribe Motors Corporation and the defendant Brañuela; the conveyance made to it by the Caribe Motors Corporation of its rights as conditional seller; the seizure of the vehicle by the Treasurer; the nonperformance of the contract on the part of the purchaser in using or allowing the vehicle to be used for the transportation of liquors in violation of the law; and lastly, that the purchaser owed the sum of $528.12 of the purchase price. The petitioner concluded by praying for an order directing the marshal to seize the automobile and deliver it to the petitioner so that the latter might dispose of it in con-

formity with the aforesaid act regarding conditional sales of personal property. The Treasurer appeared on the day set for the hearing, but codefendant Brañuela failed to appear. The Treasurer admitted the facts alleged in the petition; but he set up that § 62 of the Alcoholic Beverages Act confers on him a paramount right upon said automobile, and he *further alleged that the petition did not state facts sufficient to constitute a cause of action.*

We must bear in mind which are the facts *alleged* in the petition, *accepted* by the Treasurer of Puerto Rico, on which the first opinion of the *Brañuela* case is based. They are as follows: (1) the execution of a conditional sale contract between Caribe Motors Corporation and the defendant Brañuela; (2) conveyance by the Caribe Motors Corporation of its rights as seller to the General Motors Acceptance; (3) the confiscation of the vehicle by the Treasurer; (4) the breach of contract on the part of the purchaser in using or allowing the vehicle to be used for the transportation of liquors in violation of the law; and lastly, that the purchaser Brañuela owed the sum of $528.12 of the purchase price.

The opinion continues: "As the appellant mainly relies for its contention upon the interpretation to be given to § 62, *supra*, it is proper to transcribe the same herein for a better understanding of the discussion:

" 'Section 62.—The Treasurer is hereby authorized to confiscate any vehicle, boat, launch, or other water or air craft which is apprehended loaded or while loading, transporting, carrying or transferring any distilled spirits or alcoholic beverages illegally manufactured, imported, distilled or rectified and on which the taxes prescribed by this Act have not been paid; and same shall be sold at public auction for the benefit of The People of Puerto Rico, *Provided,* That the Treasurer in his discretion may, if the public

service so requires, designate not more than five (5) of such motor vehicles or boats to be used by duly authorized officials and agents of the Bureau of Alcoholic Beverages and Narcotics.'

"The above provision is mandatory in so far as it authorizes the Treasurer to confiscate any vehicle, boat, etc., which is apprehended in the transportation of any distilled spirits or alcoholic beverages on which the taxes prescribed by law have not been paid. Statutes such as the one under consideration have been given different constructions as regards any rights to the vehicle held by third persons who had no knowledge of, or who had not consented to the unlawful use of the property, either expressly or impliedly. The appellant [General Motors Acceptance] in its brief as well as in its oral argument, proceeds on the theory that it did not have knowledge of, nor in any way consented to, the illegal use of the vehicle and asks us to construe § 62, *supra*, in the sense that its provisions are not applicable to it and that, therefore, its rights can not be affected by the violation of the law committed by the conditional buyer or its agent. The argument of the appellant is not well founded, for it does not at all appear from the record that it is the innocent third party referred to in the decisions cited by it. The mere fact that the appellant is the assignee of the rights of the conditional seller does not necessarily mean that, prior to the violation which led to the seizure of the vehicle, it knew that the latter was being used for such purposes, nor does it exclude its express or implied consent to such use, by failing to repossess the vehicle from the transgressor.

"In the case at bar the appellant has failed to place us in a position to pass upon the question raised in its brief, since there is no ground on which to rely for assuming that it is an innocent third person and it was incumbent on the

appellant—which now asserts it—to allege and prove that fact. The proceeding brought by the appellant is of a civil nature and there is no presumption whatever of innocence to justify the omission already referred to.

"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"Having laid down this principle and taking up again the pleadings of the parties we must necessarily agree with the trial court that the petition does not state facts constituting a cause of action. The appellant, as already stated by us, did not set out in any way facts placing the lower court in a position to determine whether § 62, *supra*, was really inapplicable to it."

As may be seen, what appellant sought was a declaration in the sense that as soon as the purchaser should violate the prohibition of the contract of using the vehicle for unlawful purposes, it acquired the right of repossession of the vehicle against the purchaser, and as to § 62 of the Spirits and Alcoholic Beverages Act of 1936, it became an innocent third party, irrespective of its conduct in connection with the use of the vehicle and the acts of the conditional purchaser. It was required to prove that *it knew nothing of the illegal use, nor that it had consented in any manner whatsoever prior to the violation which gave rise to the confiscation of the vehicle.*

On reconsideration—*General Motors Acceptance* v. *Brañuela,* 61 P.R.R. 701, 702–706 (De Jesús) (1943)—appellant again insisted: "That as assignee of the rights of the conditional vendor of an automobile which was captured while engaged in the transportation of intoxicating beverages upon which the tax required by law had not been paid, the appellant is an innocent third party whose interest can not be affected by the confiscation of said vehicle as prescribed by § 62 of the Spirits and Alcoholic Beverages Act." And the writer of the opinion again repeated that "In the case

at bar the appellant has failed to place us in a position to pass upon the question raised in its brief, since there is no ground on which to rely for assuming that it is an innocent third person and it was incumbent on the appellant—which now asserts—to allege and prove that fact." And Mr. Justice de Jesús added: "The appellant alleges now for the first time that the general rule to the effect that in civil proceedings in which the commission of a crime, or any kind of criminal conduct is involved, that innocence and good faith are presumed, is applicable to its case and it invokes § 85 of The Spirits and Alcoholic Beverages Act, which provides:

" 'Section 85.—Every person who violates or fails to observe any of the provisions of this Act or of the regulations which by virtue hereof may be promulgated; and every person who knowingly aids, permits, or otherwise assists another to violate or to fail to observe any of the provisions of this Act or of its regulations in regard to its provisions, shall, when no other penalty is specifically indicated, be guilty of a misdemeanor.'

"We grant that the assignee of the rights of the conditional vendor of an automobile that knowingly permits that said automobile be used for the transportation of alcoholic beverages in violation of the law, is criminally liable in accordance with what is provided in said § 85. This being so, the appellant is entitled to the presumption of innocence that it invokes. Admitting that the appellant is entitled to the presumption of an innocent third party, it has a right that it be decided if the confiscation prescribed by § 62 affects its rights on said vehicle.

"An examination of the monographs contained in American Law Reports . . . where the opinions of the State and Federal Courts interpreting the diverse statutes on the matter are collected and classified, reveals the disagreement existing between the different jurisdictions with regard to the rights

of innocent third parties when the statute, like ours, is silent about said right.

"In South Carolina, where there existed a legal provision similar to § 62, *supra,* it was decided that it should be presumed that the Legislature had the intention to exclude from the effects of the law the rights of innocent third parties, in this form avoiding that the statute would be unjust in its application. [Citations.]

"In Texas there is a statute upon the matter which expressly declares that the vehicle illegally used constitutes a public nuisance, and orders that the same be sold, if it has any value or can be used for any legitimate purpose, and the product of such sale be deposited in the Treasury of the State, and that in case it has no value, it should then be destroyed. Interpreting it, although not making reference to the rights of innocent third parties, the courts of that State have decided that the confiscated automobile was subject to the lien of the conditional vendor. In other words, that the rights of the conditional vendor were not affected by the confiscation." (Citation.)

Now comes the Gordian knot of an opinion, which as we shall see hereinafter, time and the progress of juridical science have taken upon themselves to rectify by correcting the original premises on which it is based. The opinion continues:

"On the other hand, the Supreme Court, interpreting § 3450 of the Revised Statutes of the United States, from which § 62 of The Spirits and Alcoholic Beverages Act has been taken, has decided that the confiscation proceeding is directed against the vehicle itself and not against its owner and that therefore the rights that upon said vehicle could be had by innocent third parties are not protected, except in those cases in which it is proved that the possession of the vehicle has been *obtained* by the violator without the

express or implied consent of the owner or of third innocent parties, as happens when the vehicle has been stolen. In other words, if the owner or the third innocent party directly or indirectly has placed the vehicle in the possession of the violator or of the person under whose orders he acts, the rights of the owner or of the third innocent party, under such circumstances, run the risk that goes along with whatever use to which the one in possession dedicates the vehicle." (Citations.)

The dual reason for which the preceding immediate doctrine is brought to our case law are the following: "Aside from the fact that [1] the decisions of the United States Supreme Court are mandatory on this court, there is applicable also [2] the rule of legal interpretation which provides that when a statute from another jurisdiction is adopted, unless the contrary is expressly prescribed, the jurisprudence existing in the jurisdiction of its origin at the time of its adoption will be considered as included in the terms of the statute. Following therefore for this double reason the interpretation given by the United States Supreme Court of § 3450 of the Revised Statutes, we have to arrive at the inescapable conclusion that § 62 does not protect the interests of the appellant."

Let us see now which were the decisions of the United States Supreme Court that were binding on this Court at the time that the case of *General Motors Acceptance* v. *Brañuela*, *supra*, was decided on reconsideration. The opinion mentions the cases of *Dobbins' Distillery* v. *United States*, 96 U.S. 395, 24 L.Ed. 637 (Clifford) (1878) and *Goldsmith, Jr.–Grant Co.* v. *United States*, 254 U.S. 505, 65 L.Ed. 377 (McKenna) (1921). Actually, there are four cases; we must interpolate between the two preceding ones the case of *Weeks* v. *United States*, 232 U.S. 383, 58 L.Ed. 652 (Day) (1914), and the case of *Boyd* v. *United States*, 116 U.S. 616, 29

L.Ed. 746 (Bradley) (1886), which as we shall see in the final conclusion are the only two cases of the four cited which shall deserve the honors of posterity.

The *Dobbins* case deals with the confiscation of a distillery because (1) the lessee, occupant, and operator of the distillery neglected and refused to keep the books required by law, and make the required entries in the same; that he made false entries in the books kept in the distillery, and that he omitted to enter in the same the facts required by law, with intent to defraud the revenue, and to conceal from the revenue officers facts and particulars required to be stated and entered in such books, with like intent to defraud the revenue; and that he refused to produce the books kept in the distillery when thereto requested by the revenue officers, contrary to the statute in such case made and provided; (2) that the distillery, the distilled spirits, and distilling apparatus seized were owned by the lessee, occupant, and operator, and some other person unknown, and were intended to be used by the owners in the business of a distiller, in a manner to defraud the United States, contrary to the Act of Congress; (3) that the property seized was used by its owners to defraud the United States of the tax to which the spirits distilled were by law subject, and that the United States had been thereby defrauded of a part of such tax, in violation of law.

As explained in the opinion (p. 399), throughout the trial the claimant appears to have assumed, as theory of the defense against the petition of seizure, that he was the accused party, and that he was on trial for a criminal offense created and defined by an Act of Congress. Contrariwise, the judge believed that the forfeiture was aimed against the distillery and the real and personal property used in connection with the same, including the real estate used to facilitate the operation of distilling, and which is conducive to that end as the means of ingress or egress, and all personal

property of the kind found there, together with the distilled spirits and stills wherever found.

Nor did the judge deem it necessary that the owner of the seized property should have knowledge that the lessee and distiller was committing fraud on the public revenue, in order that the information of forfeiture should be maintained. If he knowingly suffered and permitted his land to be used as a site for a distillery, the law placed him on the same footing as if he were the distiller and the owner of the lot where the distillery is located; and if fraud is shown in that case, the land was forfeited just as if the distiller were the owner.

The opinion continues: Cases arise, undoubtedly, where the judgment of forfeiture necessarily carries with it, and as part of a sentence, a conviction and judgment against the person for the crime committed; and in that state of the pleadings it is clear that the proceeding is one of a criminal character; but where the information, as in this case, does not involve the personal conviction of the wrong-doer for the offense charged, the remedy of forfeiture claimed is plainly one of a civil nature; and the conviction of the wrong-doer must be obtained, if at all, in another and wholly independent proceeding. Forfeitures, in many cases of felony, do not attach at common law where the proceeding was *in rem* until the offender is convicted, as the crown, Judge Story says, has no right to the goods and chattels of the felon, without producing the record of his conviction; but that rule, as the same learned magistrate says, was never applied to seizures and forfeitures created by statute *in rem*, cognizable on the revenue side of the exchequer court, for the reason that the thing in such a case is primarily considered as the offender, or rather that the offense is attached primarily to the thing, whether the offense be *malum prohibitum* or *malum in se*; and he adds, that the same principles apply to proceedings *in rem* in the admiralty.

The opinion continues: Corresponding views were expressed by the same learned judge in a case decided at a much later period, in which he remarked that the act of Congress in question made no exception whatsoever, whether the alleged aggression was with or without the cooperation of the owners. Nor, said the judge in that case, is there anything new in a provision of that sort. It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offense has been committed, as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof, the necessity of the case requiring it as the only adequate means of suppressing the offense or wrong, or of insuring an indemnity to the injured party. Nothing can be plainer in legal decision than the proposition that the offense therein defined is attached primarily to the distillery, and the real and personal property used in connection with the same, without any regard whatsoever to the personal misconduct or responsibility of the owner, beyond what necessarily arises from the fact that he leased the property to the distiller, and suffered it to be occupied and used by the lessee as a distillery. Cases often arise where the property of the owner is forfeited on account of the fraud, neglect, or misconduct of those entrusted with its possession, care, and custody, even when the owner is otherwise without fault; and Judge Story remarked, in the case last cited, that the doctrine is familiarly applied to cases of smuggling and other misconduct under the revenue laws, as well as to other cases arising under the embargo and nonintercourse acts of Congress.

The pertinent portion of the opinion in this question ends with the following phrase: Controversies of the kind have arisen in the judicial history of the United States; and it has always been held in such cases that the acts of the master and crew bind the interest of the owner of the ship, whether

he be innocent or guilty, and that in sending the ship to sea under their charge he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by means of their unlawful or wanton misconduct.

The second case of the Supreme Court of the United States involved in this issue is *Boyd* v. *United States*, 116 U.S. 616, 29 L.Ed. 746, 750–752 (Bradley) (1886). It deals with an information filed by the District Attorney of the United States in the District Court for the Southern District of New York in a case of seizure and forfeiture of property against 35 cases of plate glass seized by the collector as forfeited to the United States under § 12 of the Act to amend the Customs Revenue Laws of June 22, 1874. It is declared by that section that any owner, importer, consignee, etc., who shall, with intent to defraud the revenue, make, or attempt to make, any entry of imported merchandise, by means of any fraudulent or false invoice, affidavit, letter or paper, or by means of any false statement, written or verbal, or who shall be guilty of any wilful act or omission by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper, or statement, or affected by such act or omission, shall for each offense be fined in any sum not less than $50, or be imprisoned for any time not exceeding two years, or both; and, in addition to such fine, such merchandise shall be forfeited. It was claimed that the goods seized should be returned because they were not seized according to the proceeding provided by law.

Against this allegation the District Attorney offered in evidence an order made by the judge requiring them to produce the invoice of the cases. The claimants, in obedience to the notice, but objecting to its validity and the constitutionality of the law, produced the invoice; when it was offered in evidence they objected to its reception on the ground that

in a suit for forfeiture no evidence can be compelled from the claimants themselves, and also that the statute, so far as it compels production of evidence to be used against the claimants, is unconstitutional and void. Notwithstanding the objection, the evidence was accepted and the jury brought a verdict condemning the thirty-five cases of glass which were seized. The verdict of the jury was set aside because it violated the provisions of the Fourth and Fifth Amendments of the United States Constitution, according to the following grounds of the opinion of Mr. Justice Bradley:

We have already noticed the intimate relation between the two amendments. They throw great light on each other. For the unreasonable searches and seizures condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man in a criminal case to be a witness against himself, which is condemned in the Fifth Amendment, throws light on the question as to what is an unreasonable search and seizure within the meaning of the Fourth Amendment. And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself. We think it is within the clear intent and meaning of those terms. We are also clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal. In this very case, the ground of forfeiture as declared in the 12th section of the act of 1874, on which the information is based, consist of certain acts of fraud committed against the public revenue in relation to imported merchandise, which are made criminal by the statute; and it is de-

clared that the offender shall be fined not exceeding $5,000 nor less than $50, or be imprisoned not exceeding two years, or both; and in addition to such fine such merchandise shall be forfeited. These are the penalties affixed to the criminal acts; the forfeiture sought by this suit being one of them. If an indictment had been presented against the claimants, upon conviction the forfeiture of the goods could have been included in the judgment. If the government prosecutor elects to waive an indictment and to file a civil information against the claimants (that is, civil in form) can he by this device take from the proceeding its criminal aspect and deprive the claimants of their immunities as citizens, and extort from them a production of their private papers, or, as an alternative, a confession of guilt? This cannot be. The confiscation, though technically a civil proceeding, is in substance and effect a criminal one (citation of recent case). As, therefore, suits for penalties and forfeitures incurred by the commission of offenses against the law are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution, and of that portion of the Fifth Amendment which declares that no person shall be compelled in any criminal case to be a witness against himself; and we are further of opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself within the meaning of the Fifth Amendment to the Constitution, and is the equivalent of a search and seizure and an unreasonable search and seizure within the meaning of the Fourth Amendment.

The opinion continues: Though the proceeding in question is divested of many of the aggravating incidents of actual search and seizure, yet, as before said, it contains

their substance and essence, and effects their substantial purpose. It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.*

The third case of the Supreme Court of the United States involved in this question is *Weeks* v. *United States,* 232 U.S. 383, 58 L.Ed. 652 (Day) (1914), decided under the same principle of immunity as to searches and self-incriminating declarations of the *Boyd* case. On a count charging the use of the mail for the purpose of transporting certain coupons or tickets of a lottery in violation of § 213 of the Criminal Code, the defendant was arrested without a warrant by a police officer in the Union Station of the city of Kansas, in Missouri, while other officers had gone to the house of the defendant, entered the house and searched defendant's room and there took possession of various papers and articles which were subsequently turned over to the United States Marshal. Later in the same day the police officers returned to defendant's residence with the marshal and the latter searched the room carrying away certain letters and envelopes found in the drawer of a chiffonier. Neither the marshal nor the police officers had a search warrant. The defendant moved for the return of the documents and articles invoking the Fourth and Fifth Amendments of the United States Constitution.

The trial court returned some documents and articles, but retained those which it believed were pertinent to the charge of the offense. Among the documents which it retained were the lottery tickets, certain statements with reference to the lottery taken at the first visit of the police to defendant's room and a number of letters written by the defendant in connection to the lottery taken by the marshal upon his search of defendant's room in the second visit. Admission of this evidence was objected at the hearing, but the objection was overruled by the court. The United States Supreme Court reversed defendant's conviction based on evidence illegally obtained. Below we copy some of the grounds of the court:

The history of the Fourth Amendment, as it appears in the opinion of Mr. Justice Bradley on the *Boyd* case, shows that it took its origin in the determination of the framers of the Amendments to the Federal Constitution to provide for that instrument a bill of rights securing to the American people, among other things, those safeguards which had grown up in England to protect the people from unreasonable searches and seizures. Resistance to these practices had established the principle, which was enacted into the fundamental law as the Fourth Amendment, that man's house was his castle and not to be invaded by any general authority to search and seize his goods and papers. Judge Cooley, in his Constitutional Limitations in treating this feature of our Constitution says: "The maxim that 'every man's house is his castle' is made a part of our constitutional law in the clauses prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen."

The opinion continues: "The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering

which have resulted in their embodiment in the fundamental law of the land. The United States Marshal could only have invaded the house of the accused when armed with a warrant issued as required by the Constitution, upon sworn information and describing with reasonable particularity the thing for which the search was to be made. Instead, he acted without sanction of law, doubtless prompted by the desire to bring further proof to the aid of the Government, and under color of his office undertook to make a seizure of private papers in direct violation of the constitutional prohibition against such action. Under such circumstances, without sworn information and particular description, not even an order of court would have justified such procedure . . . ."

The fourth case of the United States Supreme Court, second case cited in the opinion of this Court on reconsideration—*General Motors Acceptance* v. *Brañuela, supra*—the case of *Goldsmith, Jr.–Grant Co.* v. *United States*, 254 U.S. 505, 65 L.Ed. 377, 378–379 (McKenna) (1921)—is a more contemporaneous version of the theory of the case cited above, including the possible philosophies involved therein, although the apparition of the national crisis produced by the Volstead Act is not the best time to gather sprouts of a new harvest nearer the realms of American domestic industries than the rough assignments of international piracy and clandestine manufacture in large scale.

The Act which is applied to the second opinion of the United States Supreme Court cited in the *Brañuela* case on reconsideration, is the original § 14 of the Congress Act on Revenue of July 13, 1866—14 Stat. at L. 151, Chapter 184—which became § 3450 of the Compilation of Revised Statutes, cited in our opinion on reconsideration in *General Motors Acceptance* v. *Brañuela,* which provides: "Whenever any goods or commodities for or in respect whereof any tax is or shall be imposed, . . . are removed, or are deposited or

concealed in any place, with intent to defraud the United States of such tax, or any part thereof, all such goods or commodities . . . shall be forfeited; and in every such case all the casks, vessels, cases, or other packages whatsoever, . . . respectively, and every vessel, boat, cart, carriage, or other conveyance whatsoever, and all horses or other animals, and all things used in the removal or for the deposit or concealment thereof, respectively, shall be forfeited." (Pages 377–378.) The *Goldsmith* case deals with the confiscation of a Hudson automobile appraised at a value of $800, it being charged that said automobile had been used by three persons in the removal and for the deposit and concealment of 58 gallons of distilled spirits upon which a tax was imposed by the United States and had not been paid.

The Grant Company had been the seller of the automobile and retained title for unpaid purchase price by Mr. Thompson, the latter being the person who had used the car in violation of § 3450, alleging that such illegal use was without the knowledge of the company or of any of its officers, nor did it or they have any notice or reason to suspect that it would be illegally used. The company filed within the proceeding a motion to direct a verdict for it on the following grounds: (1) That § 3450, U.S. Rev. Stat., was in violation of article 5 of Amendments of the Constitution of the United States, in that it deprived the Grant Company of its property without due process of law; (2) that the section was not to be construed to forfeit the title of a third party entirely innocent of wrongdoing, and that the proper construction of the section was that it contemplated forfeiting only the interest or title of the wrongdoer; (3) that the title reserved by the company for the balance of the purchase money had never been divested, and therefore could not be condemned, and that only the interest of wrongdoer could be condemned.

The judge overruled the motion to direct a verdict on the grounds adduced by the third innocent party, and on the contrary, charged the jury to render a verdict finding the car guilty of illegal use of property. In effect, the jury found the car guilty of illegal use and, in pursuance of the verdict, a judgment of condemnation and forfeiture was entered. But as a bond with security had been given for the car, it was adjudged that the United States recover from the Grant Company as principal and J. W. Goldsmith, Jr., as security, the principal sum of $800 and costs.

It is impossible to understand the magic thread of this spider web without citing the grounds of the second decision. The learned judge stated: "If the case were the first of its kind, it and its apparent paradoxes might compel a lengthy discussion to harmonize the section with the accepted tests of human conduct. Its words, taken literally, forfeit property illicitly used, though the owner of it did not participate in or have knowledge of the illicit use. There is strength, therefore, in the contention that, if such be the inevitable meaning of the section, it seems to violate that justice which should be the foundation of the due process of law required by the Constitution. It is, hence, plausibly urged that such could not have been the intention of Congress; that Congress necessarily had in mind the facts and practices of the world, and that, in the conveniences of business and of life, property is often and sometimes necessarily put into the possession of another than its owner. And it follows, is the contention, that Congress only intended to condemn the interest the possessor of the property might have to punish his guilt, and not to forfeit the title of the owner, who was without guilt.

"Regarded in this abstraction [says the judge] the argument is formidable; but there are other and militating considerations. Congress must have taken into account the

necessities of the government, its revenues and policies, and was faced with the necessity of making provision against their violation or evasion, and the ways and means of violation or evasion. In breaches of revenue provisions, some forms of property are facilities, and therefore it may be said that Congress interposes the care and responsibility of their owners in aid of the prohibitions of the law and its punitive provisions, by ascribing to the property a certain personality, a power of complicity and guilt in the wrong. In such case there is some analogy to the law of deodand [a thing that must be offered to God] by which a personal chattel that was the immediate cause of the death of any reasonable creature was forfeited. [It was forfeited to the King to be distributed in alms by his high almoner.] To the superstitious reason to which the rule was ascribed, Blackstone adds 'that such misfortunes are in part owing to the negligence of the owner, and therefore he is properly punishable by such forfeiture.' And he observed: 'A like punishment is in like cases inflicted by the Mosaical law: "If an ox gore a man that he die, the ox shall be stoned, and his flesh shall not be eaten." And, among the Athenians, whatever was the cause of a man's death, by falling upon him, was exterminated or cast out of the dominions of the republic.' [Citations.]

"But whether the reason for § 3450 be artificial or real, it is too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced."

It is not our intention to rebate the delicate interest that might have had the learned judge of the fourth case, second case cited in the *Brañuela* case on reconsideration, of keeping afloat the national treasury. But his reasoning seems to us more imbued with superstition than with science. Here we have one of those malign implications of the Talion law submitted to a symbolic process of purification. Only here we do not have a question of an eye for an eye a tooth for a

tooth, always susceptible of a reasonable equivalent, but of a considerable dispossession of property for a small shortage of public revenue; public vindictiveness becoming Pharisaism.

The learned judge continues with his analysis: *"Dobbins Distillery* v. *United States,* 96 U.S. 395, 24 L.Ed. 637, is an example of the rulings we have before made. It cites and reviews prior cases, applying their doctrine, and sustaining the constitutionality of such laws. It militates, therefore, against the view that § 3450 is not applicable to a property whose owner is without guilt. In other words, it is the ruling of that case, based on prior cases, that the thing is primarily considered the offender. And the principle and practice have examples in admiralty . . . .

"Counsel resists the reasoning and precedent of these cases in an argument of considerable length, erected on the contention of the injustice of making an innocent man suffer for the acts of a guilty one, and the anxious solicitude a court must feel and exercise, and which, it is said, it has often expressed, and by which it has been impelled to declare laws unconstitutional that offend against reason and justice.

"The changes are rung on the contention, and illustrations are given of what is possible under the law if the contention be rejected. It is said that a Pullman sleeper can be forfeited if a bottle of illicit liquor be taken upon it by a passenger, and that an ocean steamer can be condemned to confiscation if a package of like liquor be innocently received and transported by it. Whether the indicated possibilities under the law are justified *we are not called upon to consider.* It has been in existence since 1866, and has not yet received such amplitude of application. When such application shall be made, it will be time enough to pronounce upon it. And we also reserve opinion as to whether the section can be extended to property stolen from the owner, or otherwise taken from him without his privity or consent."

From this curious antinomy, which on one hand establishes that the procedures of confiscation are *in rem* proceedings which can do without the will of the owner or possessor, and on the other hand establishes that said proceedings are of a criminal nature and need a previous declaration of criminal intent, following the old principle of common law which prohibited the King from disposing of property used in the crime before the wrongdoer was found guilty, evolves the subsequent case law of the United States Supreme Court. We shall be satisfied with citing those decisions around which the reform debate has developed.

Perhaps it would be convenient to stress an aspect of the antinomy which indeed has not helped us in making clear the question of constitutionality and which is produced in the ideological controversy between federalists and integralists, so characteristic of the constitutional case law of the United States Supreme Court. One of the cases which may serve as the best example of this tension is *Wolf* v. *Colorado*, 338 U.S. 25, 93 L.Ed. 1782, 1784–1788 (Frankfurter) (1949).

The question involved in this case is raised by the learned judge at the beginning of the opinion, by way of a question: Does a conviction by a State court for a State offense deny the "due process of law" required by the Fourteenth Amendment, solely because evidence that was admitted at the trial was obtained under circumstances which would have rendered it inadmissible in a prosecution for violation of a federal law in a court of the United States because there seemed to be an infraction of the Fourth Amendment as applied in *Weeks* v. *United States*? As soon as the question is posed the judge answers it in the following terms: Unlike the specific requirements and restrictions placed by the Bill of Rights (Amendments I to VIII) upon the administration of criminal justice by federal authority, the Fourteenth Amendment does not subject criminal justice in the States to specific

limitations. The notion that the "due process of law" guaranteed by the Fourteenth Amendment is shorthand for the first eight amendments of the Constitution and thereby incorporates them has been rejected by this Court again and again, after impressive consideration.

The opinion continues: For the purposes of ascertaining the restrictions which the Due Process Clause imposed upon the United States in the enforcement of their criminal law, the United States Supreme Court adheres to the views expressed in *Palko* v. *Connecticut*, 302 U.S. 319, 82 L.Ed. 288. That decision speaks to us with the great weight of the authority, particularly in matters of civil liberty, of a court that included Mr. Chief Justice Hughes, Mr. Justice Brandeis, Mr. Justice Stone and Mr. Justice Cardozo, to name only the dead. In rejecting the suggestion that the Due Process Clause incorporated the original Bill of Rights, Mr. Justice Cardozo reaffirmed on behalf of that Court a different but deeper and more pervasive conception of the Due Process Clause. Due process of law thus conveys neither formal nor fixed nor narrow requirements. It is the compendious expression for all those rights which the courts must enforce because they are basic to our free society. But basic rights do not become petrified as of any one time, even though, as a matter of human experience, some may not too rhetorically be called eternal verities. It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalogue of what may at a given time be deemed the limits or the essentials of fundamental rights. The real clue to the problem confronting the judiciary in the application of the Due Process Clause is not to ask where the line is once and for all to be drawn but to recognize that it is for the court to draw it by the gradual and empiric process of "inclusion and exclusion." *Davidson* v. *New Orleans*, 96 U.S. 97, 104,

24 L.Ed. 616, 619. This was the court's insight when first called upon to consider the problem; to this insight the court has on the whole been faithful as case after case has come before it since *Davidson* v. *New Orleans* was decided.

The opinion continues: The security of one's privacy against arbitrary intrusion by the police, which is at the core of the Fourth Amendment, is basic to a free society. It is therefore implicit in the concept of ordered liberty and as such enforceable against the States through the Due Process Clause. The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, does not need the commentary of recent history to be condemned as inconsistent with the conception of human rights enshrined in the history and the basic constitutional documents of English-speaking people. Accordingly, we have no hesitation in saying that were a State affirmatively to sanction such police incursion into privacy it runs counter to the guaranty of the Fourteenth Amendment. But the ways of enforcing such a basic right raise questions of a different order. How such arbitrary conduct should be checked, what remedies against it should be afforded, the means by which the right should be made effective, are all questions that are not to be so dogmatically answered as to preclude the varying solutions which spring from an allowable range of judgment on issues not susceptible of quantitative solution.

The opinion follows: In *Weeks* v. *United States*, this court held that in a federal prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure. This ruling was made for the first time in 1914. It was not derived from the explicit requirements of the Fourth Amendment; it was not based on legislation expressing Congressional policy in the enforcement of the Constitution. The decision was a matter of judicial implica-

tion. Since then it has been frequently applied and we stoutly adhere to it. But the immediate question is whether the basic right to protection against arbitrary intrusion by the police demands the exclusion of logically relevant evidence obtained by an unreasonable search and seizure because, in a federal prosecution for a federal crime, it would be excluded. As a matter of inherent reason, one would suppose this to be an issue as to which men with complete devotion to the protection of the right of privacy might give different answers. When we find that in fact most of the English-speaking world does not regard as vital to such protection the exclusion of evidence thus obtained, we must hesitate to treat this remedy as an essential ingredient of the right. We hold, therefore, that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure.

The case of *Wolf* v. *Colorado* was overruled by the case of *Mapp* v. *Ohio*, 367 U.S. 643, 6 L.Ed. 2d 1081, 1085–1092 (Clark) (1961). On May 23, 1957 three Cleveland police officers arrived at appellant's residence in that city, pursuant to an information that "a person [was] hiding out in the home, who was wanted for questioning in connection with a recent bombing, and that there was a large amount of policy paraphernalia being hidden in the home." Miss Mapp and her daughter by a former marriage lived on the top floor of the two-family dwelling. Upon arrival at that house, the officers knocked on the door and demanded entrance but appellant, after telephoning her attorney, refused to admit them without a search warrant. They advised their headquarters of the situation and undertook surveillance of the house. The officers again sought entrance some three hours later when four or more additional officers arrived on the scene. When Miss Mapp did not come to the door immediately, at least one of the several doors to the house was forcibly

opened and the policemen gained admittance. Meanwhile Miss Mapp's attorney arrived, but the officers, having secured their own entry, and continuing in their defiance of the law, would permit him neither to see Miss Mapp nor to enter the house. It appears that Miss Mapp was halfway down the stairs from the upper floor to the front door when the officers, in this highhanded manner, broke into the hall. She demanded to see the search warrant. A paper, claimed to be a warrant, was held by one of the officers. She grabbed the warrant and placed it in her bosom. A struggle ensued in which the officers recovered the piece of paper and as a result of which they handcuffed appellant because she had been belligerent in resisting their official rescue of the warrant from her person. Running roughshod over appellant, a policeman grabbed her, twisted her hand, and she yelled and pleaded with him because it was hurting. Appellant, in handcuffs, was then forcibly taken upstairs to her bedroom where the officers searched a dresser, a chest of drawers, a closet and some suitcases. They also looked into a photo album and through personal papers belonging to the appellant. The search spread to the rest of the second floor including the child's bedroom, the living room, the kitchen and a dinette. The basement of the building and a trunk found therein were also searched. The obscene materials for possession of which she was ultimately convicted were discovered in the course of that widespread search.

The opinion in the case of *Mapp* v. *Ohio* contains the most orderly and reliable exposition of the chronology of the decisions on searches and seizures, in federal as well as in state courts, reviewed by the United States Supreme Court, setting out two cases—*Boyd* v. *United States,* 116 U.S. 616, 29 L.Ed. 746 (Bradley) (1886) and *Weeks* v. *United States,* 232 U.S. 383, 58 L.Ed. 652 (Day) (1914), as those which have served as the pillars of the Fourth and Fifth Amendments of the

Federal Constitution. Copying from the opinion Mr. Justice Clark says: "Seventy-five years ago, in *Boyd* v. *United States*, . . . considering the Fourth and Fifth Amendments as running 'almost into each other' on the facts before it, this Court held that the doctrines of those Amendments 'apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life . . . .'

"In this jealous regard for maintaining the integrity of individual rights, the Court gave life to Madison's prediction that 'independent tribunals of justice . . . will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights.' . . . Concluding, the Court specifically referred to the use of the evidence there seized as 'unconstitutional.' . . .

"Less than 30 years after Boyd, this Court, in Weeks v. United States, . . . [the United States Supreme Court] stated that 'the Fourth Amendment . . . put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints [and] . . . forever secure[d] the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law . . . and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws.'

". . . Thus, in the year 1914, in the Weeks case, this Court 'for the first time' held that 'in a federal prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure.' . . . It meant, quite simply, that 'conviction by means of unlawful seizures and enforced confessions . . . should find no sanction in the judgments of the courts . . . .'

"There are in the cases of this Court some passing references to the Weeks rule as being one of evidence. But the plain and unequivocal language of Weeks—and its later

paraphrase in Wolf—to the effect that the Weeks rule is of constitutional origin, remains entirely undisturbed. In Byars v. United States, 273 U.S. 28, 71 L.Ed. 520 . . . a unanimous Court declared that 'the doctrine [cannot] . . . be tolerated under our constitutional system, that evidences of crime discovered by a federal officer in making a search without lawful warrant may be used against the victim of the unlawful search where a timely challenge has been interposed.' "

The opinion in the *Mapp* v. *Ohio* case continues: "In 1949, 35 years after Weeks was announced, this Court, in Wolf v. Colorado (U.S.) supra, again for the first time, discussed the effect of the Fourth Amendment upon the States through the operation of the Due Process Clause of the Fourteenth Amendment . . . .

"Nevertheless, after declaring that the 'security of one's privacy against arbitrary intrusion by the police' is 'implicit in "the concept of ordered liberty" and as such enforceable against the States through the Due Process Clause' . . . . [The Court declares] that 'the contrariety of views of the States' on the adoption of the exclusionary rule of Weeks was 'particularly impressive' . . . and, in this connection, that it could not 'brush aside the experience of States which deem the incidence of such conduct by the police too slight to call a deterrent remedy . . . by overriding the [States'] relevant rules of evidence.' . . . While in 1949, prior to the Wolf case, almost two-thirds of the States were opposed to the use of the exclusionary rule, now, despite the Wolf case, more than half of those since passing upon it, by their own legislative or judicial decision, have wholly or partly adopted or adhered to the Weeks rule. . . . Significantly, among those now following the rule is California, which, according to its highest court, was 'compelled to reach that conclusion because other remedies have completely failed to

secure compliance with the constitutional provisions. . . .'
In connection with this California case, we note that the
second basis elaborated in Wolf in support of its failure to
enforce the exclusionary doctrine against the States was that
'other means of protection' have been afforded 'the right to
privacy.'. . .

"Some five years after Wolf, in answer to a plea made
here term after term that we overturn its doctrine on ap-
plicability of the Weeks exclusionary rule, this Court indi-
cated that such should not be done until the States had 'ade-
quate opportunity to adopt or reject the [Weeks] rule.'

". . . Today we once again examine Wolf's constitutional
documentation of the right to privacy free from unreason-
able state intrusion, and, after its dozen years on our books,
are led by it to close the only courtroom door remaining open
to evidence secured by official lawlessness in flagrant abuse
of that basic right, reserved to all persons as a specific
guarantee against that very same unlawful conduct. We
hold that all evidence obtained by searches and seizures in
violation of the Constitution is, by that same authority, in-
admissible in a state court."

The opinion in the *Mapp* case concludes thus: "More-
over, our holding that the exclusionary rule is an essential
part of both the Fourth and Fourteenth Amendments is not
only the logical dictate of prior cases, but it also makes very
good sense. There is no war between the Constitution and
common sense. Presently, a federal prosecutor may make no
use of evidence illegally seized, but a State's attorney across
the street may, although he supposedly is operating under
the enforceable prohibitions of the same Amendment. Thus
the State, by admitting evidence unlawfully seized, serves
to encourage disobedience to the Federal Constitution which
it is bound to uphold. Moreover, as was said in Elkins [364
U.S. 221], 'the very essence of a healthy federalism depends

upon the avoidance of needless conflict between state and federal courts.' "

In the case of One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 14 L.Ed.2d 170, the so-called confiscations of a civil nature of property used in the commission of a crime reach a crisis, as part of the rule of exclusion. It represents a dramatic victory of the science of law over the superstition of the expiation of the objects and an impressive credit to the learned Justices Bradley (1886) and Day (1914), writers of the opinions in the cases of Boyd v. United States and Weeks v. United States, respectively, previously cited.

The facts were the following: In the early hours of December 16, 1960, two law enforcement officers of the Pennsylvania Liquor Control Board stationed near Camden, New Jersey, at the approach to the Benjamin Franklin Bridge, observed a 1958 Plymouth Sedan bearing Pennsylvania license plates proceeding toward the bridge in the direction of Philadelphia, Pennsylvania. The officers, noting that the car was low in the rear, quite low in the rear, followed it across the bridge into Philadelphia. They stopped the automobile a short distance within the city, identified themselves and questioned the owner, George McGonigle. The officers then searched the car and, in the rear and the trunk, found 31 cases of liquor not bearing the tax seals. The car and liquor were seized and McGonigle was arrested and charged with violation of Pennsylvania law. The officers did not have either a search or arrest warrant. According to a Pennsylvania statute the Commonwealth filed a petition for forfeiture of the automobile. At the hearing McGonigle, by timely objection, sought dismissal of the forfeiture petition on the ground that the forfeiture of the automobile depended upon the admission of evidence illegally obtained in violation of the Fourth Amendment to the Constitution as applied to the States by the Fourteenth Amendment.

The trial court ordered the return after having concluded that the search was based on evidence illegally obtained, since under the particular circumstances of the case the officers acted without probable cause. An intermediate appellate court reversed the order of return and the Supreme Court of Pennsylvania affirmed the intermediate court on the ground that the exclusionary rule in the case of *Mapp* v. *Ohio*, as an essential part of the Fourth and Fourteenth Amendments, applies only to criminal prosecutions and is not applicable in a forfeiture proceeding which the Pennsylvania Court deemed civil in nature. In the opinion of the case of *One Plymouth Sedan* v. *Pennsylvania*, object of this gloss, the United States Supreme Court reversed the decision of the Supreme Court of Pennsylvania on the following grounds:

As this court (United States Supreme Court) has acknowledged, the leading case of the subject of search and seizure is the case of *Boyd* v. *United States*, 116 U.S. 616, 29 L.Ed. 746 (1886), which itself was not a criminal case, but was a proceeding to forfeit 35 cases of plate glass which had been illegally imported without payment of the customs duty. In the *Boyd* case, *supra*, Justice Bradley stated thus: We are also clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal. In this very case, the ground of forfeiture as declared in the 12th section of the act of 1874, on which the information is based, consists of certain acts of fraud committed against the public revenue in relation to imported merchandise, which are made criminal by the statute; and it is declared, that the offender shall be fined not exceeding $5,000 nor less than $50, or be imprisoned not exceeding two years, or both; and in addition to such fine such merchandise shall be forfeited. These are

the penalties affixed to the criminal acts; the forfeiture sought by this suit being one of them. If an indictment had been presented against the claimants, upon conviction the forfeiture of the goods could have been included in the judgment. If the government prosecutor elects to waive an indictment, and to file a civil information against the claimants (that is, civil in form) can he by this device take from the proceeding its criminal aspect and deprive the claimants of their immunities as citizens, and extort from them a production of their private papers, or, as an alternative, a confession of guilt? This cannot be. The information, though technically a civil proceeding, is in substance and effect a criminal one. As, therefore, suits for penalties and forfeitures incurred by the commission of offenses against the law are of a quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution.

The opinion in the case of *One 1958 Plymouth Sedan* v. *Pennsylvania* continues: The Commonwealth further argues that *Boyd's* unequivocal statement that the Fourth Amendment applies to forfeiture proceedings as well as criminal prosecutions has been undermined by the statements of this court in *United States* v. *Jeffers*, 342 U.S. 48, 54, 96 L.Ed. 59, 65 and *Trupiano* v. *United States*, 334 U.S. 699, 710, 92 L.Ed. 1663, 1671. *Jeffers* and *Trupiano*, unlike *Boyd*, were not forfeiture cases. They were federal criminal prosecutions. In both cases the United States Supreme Court held that evidence seized in violation of the Fourth Amendment was not admissible notwithstanding the fact that the evidence involved was contraband. By way of dictum, however, since the point was not before it, the court stated in these (two) cases, that its ruling that the contraband was excludable as illegally seized did not mean that the Government was required to return the illegally imported narcotics to Jeffers or the unregistered still, alcohol and mash to Trupiano.

Mr. Justice Goldberg continues: The nature of the contraband involved in these (two) cases clearly explains these statements of the court. Both *Trupiano* and *Jeffers* concerned objects the possession of which, without more, constitutes a crime. The repossession of such per se contraband by Jeffers and Trupiano would have subjected them to criminal penalties. The return of the contraband would clearly have frustrated the express public policy against the possession of such objects.

It is apparent—continues Mr. Justice Goldberg—that the nature of the property here, though termed contraband by Pennsylvania, is quite different. There is nothing even remotely criminal in possessing an automobile. It is only the alleged use to which this particular automobile was put that subjects Mr. McGonigle to its possible loss. And it is conceded here that the Commonwealth can not establish an illegal use without using the evidence resulting from the search which is challenged as having been in violation of the Constitution. Furthermore, the return of the automobile to the owner would not subject him to any possible criminal penalties for possession or frustrate any public policy concerning automobiles, as automobiles. We, therefore, do not have before us a case in any way analogous to the contraband involved in *Jeffers* and *Trupiano* and these cases can in no way be deemed to impair the continued validity of *Boyd* which, like this case, involved property not intrinsically illegal in character.

Here is the last part of the opinion of Justice Goldberg: Finally, as Mr. Justice Bradley aptly pointed out in *Boyd*, a forfeiture proceeding is quasi-criminal in character. Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law. In this case McGonigle, the driver and owner of the automobile, was arrested and charged with a criminal offense against the Pennsylvania liquor laws. If convicted of any one of the possible

offenses involved, however, he would be subject, if a first offender, to a minimum penalty of a $100 fine and a maximum penalty of a $500 fine. In this forfeiture proceeding he was subject to the loss of his automobile, which at the time involved had an estimated value of approximately $1,000, a higher amount than the maximum fine in the criminal proceeding. It would be anomalous indeed, under these circumstances, to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence illegally obtained would be admissible.[11] That the forfeiture is clearly a penalty for the criminal offense and can result in even greater punishment than the criminal prosecution has in fact been recognized by the Pennsylvania courts. In *Commonwealth* v. *One 1959 Chevrolet Impala Coupe*, involving a forfeiture in 1962, the Pennsylvania Superior Court in affirming the exercise of discretion to waive a forfeiture following a criminal prosecution, stated: "It seemed to the court below that to make this man pay the sum of $500.00 in fines, together with the costs of the proceeding and the storage cost for the automobile, was sufficient punishment under all the circumstances. To forfeit a 1959 Chevrolet Impala Coupe in addition to the above seemed to the court below to be entirely out of proportion to the crime involved. We cannot say that the court below abused its discretion in so acting." 201 Pa. Super. 145, 150, 191 A.2d 717, 719. In sum, we conclude that the nature of a forfeiture proceeding, so well described by Mr. Justice Bradley in *Boyd*, and the reasons which led the Court to hold that the exclusionary

---

("[11] This Court in *Boyd* v. *United States, supra*, at 638, 29 L.Ed. at 753, rejected any argument that the technical character of a forfeiture as an *in rem* proceeding against the goods had any effect on the right of the owner of the goods to assert as a defense violations of his constitutional rights.")

rule of *Weeks* v. *United States, supra,* is obligatory upon the States under the Fourteenth Amendment, so well articulated by Mr. Justice Clark in *Mapp,* support the conclusion that the exclusionary rule is applicable to forfeiture proceedings such as the one involved here.

For a doctrinal substantiation subsequent to the *Mapp* v. *Ohio* case, in some aspects of the exclusion of evidence illegally obtained, see: *Ker* v. *California,* 374 U.S. 23, 30, 33, 10 L.Ed.2d 726, 735–737 (Clark) (1963); *Stoner* v. *California,* 376 U.S. 483, 490, 11 L.Ed.2d 856, 861 (Stewart) (1964); *Aguilar* v. *Texas,* 378 U.S. 108, 111, 12 L.Ed.2d 723, 726, 727 (Goldberg) (1964); *Stanford* v. *Ohio,* 379 U.S. 476, 481–482, 13 L.Ed.2d 431, 434, 435 (Stewart) (1965); *Preston* v. *United States,* 376 U.S. 364, 11 L.Ed.2d 777, 780, 781 (Black) (1964). For a similar doctrinal substantiation subsequent to the case of *One 1958 Plymouth Sedan* v. *Commonwealth of Pennsylvania,* as to the criminal nature of the forfeiture, etc., see *State* v. *La Bella,* 212 A.2d 192, 196, 197 (Conklin) (June 28, 1965); *Carson* v. *State,* 144 S.E.2d 384, 386 (Grice) (Sept. 14, 1965); *State* v. *Simpson,* 137 N.W.2d 391, 393 *in fine* (Gordon) (Nov. 2, 1965); *United States* v. *One 1964 Chevrolet Impala Automobile,* 247 F.Supp. 329, 334 *in fine* (Hemphill) (Nov. 18, 1965); *United States* v. *Maroney,* 355 F.2d 302, 311 (Freedman) (January 11, 1966); *Williams* v. *Williams,* 221 N.E.2d 622, 625, 626 (Nichols) (July 22, 1966); *Del Presto* v. *Del Presto,* 223 A.2d 217, 218 (Consodine) (Sept. 22, 1966); *Cooper* v. *State of California,* 35 U.S. L.W. 4209, 4210 (Black) (Feb. 20, 1967); see, also, *Constitutional Law—Searches and Seizures—Illegally Seized Evidence Barred in a Forfeiture Action* (Gloss on the case of *One 1958 Plymouth Sedan*), 11-1 Vill. L. Rev. 163, 166 (1965); *The Fourth Amendment and the Exclusionary Rule in Civil Cases,* 43 Denver L.J. 511, 516, 517 (1966); *Statutory Forfeitures—*

*Extension of the Exclusionary Rule to Civil Actions*, 40 Tul. L. Rev. 672, 673, 676, 677; *Evidence—Constitutional Law—Evidence Seized by Police Without Warrant or Probable Cause Excluded in Forfeiture Action*, 40 Notre Dame Law. 673, 674, 675 (1964–65); *Lawfulness of Seizure of Property Used in Violation of Law as Prerequisite to Forfeiture Action or Proceeding*, 8 A.L.R.3d 473, 480–482 (1966).

Perhaps it would be convenient for a better understanding of the question in issue, to make history of the legislative development of § 3450 of the United States Revised Statutes. This provision stems from § 14 of the Act of July 13, 1866—14 United States Statutes at Large 151 (Little, Brown and Company edition of 1868), which provides:

"Sec. 14. That in case any goods or commodities for or in respect whereof any tax is or shall be imposed, or any materials, utensils, or vessels proper or intended to be made use of for or in the making of such goods or commodities shall be removed, or shall be deposited or concealed in any place, with intent to defraud the United States of such tax, or any part thereof, all such goods and commodities, and all such materials, utensils, and vessels, respectively shall be forfeited; and in every such case, and in every case where any goods or commodities shall be forfeited under this act, or any other act of Congress relating to the internal revenue, all and singular the casks, vessels, cases or other packages whatsoever, containing, or which shall have contained, such goods or commodities, respectively, and every vessel, boat, cart, carriage, or other conveyance whatsoever, and all horses or other animals, and all things used in the removal or for the deposit or concealment thereof, respectively, shall be forfeited; and every person who shall remove, deposit, or conceal, or be concerned in removing, depositing or concealing any goods or commodities for or in respect whereof any tax is or shall be imposed, with intent to defraud the United States of such tax or any part thereof, shall be liable to a fine or penalty of not exceeding five hundred dollars."

According to table B of the appendix of the provisions included in the Internal Revenue Code—53 United States

732

Statutes at Large, p. XLI (1939)—§ 3450 is divided into two new sections: § 2807 and § 3321 (a) (b) of the Internal Revenue Code which, regarding the implements and material used in the distillery of alcohol, provides: Sec. 2807. All boilers, stills, or other vessels, tools, and implements, used in distilling or rectifying, and forfeited under any of the provisions of this chapter, and all condemned material, together with any engine or other machinery connected therewith, and all empty barrels, and all grain or other material suitable for distillation, shall, under the direction of the court in which the forfeiture is recovered, be sold at public auction, and the proceeds thereof, after deducting the expenses of sale, shall be disposed of according to law; § 3321 (a) (1) which provides: (a) Penalty.—Every person who removes, deposits, or conceals, or is concerned in removing, depositing, or concealing any goods or commodities for or in respect whereof any tax is or shall be imposed, with intent to defraud the United States of such tax or any part thereof, shall be liable to a fine of not more than $5,000 or be imprisoned for not more than 3 years, or both; (b) Forfeiture.—(1) Goods.—Whenever any goods or commodities for or in respect whereof any tax is or shall be imposed, or any materials, utensils, or vessels proper or intended to be made use of for or in the making of such goods or commodities are removed, or are deposited or concealed in any place, with intent to defraud the United States of such tax, or any part thereof, all such goods and commodities, and all such materials, utensils, and vessels, respectively, shall be forfeited; (b) (2) Packages.—In every such case all the casks, vessels, cases, or other packages whatsoever, containing, or which shall have contained, such goods or commodities, respectively, shall be forfeited; (b) (3) Conveyances.—Every vessel, boat, cart, carriage, or other conveyance whatsoever, and all horses or other animals, and all things used in the

removal or for the deposit or concealment thereof, respectively, shall be forfeited.

Finally, we should merely enumerate, as quasi-contemporaneous legislation, the amendment made to § 3321 (a) (1) of the Internal Revenue Code of 1939 by § 7206 (4) of the Internal Revenue Code of 1954—26 U.S.C.A. § 7206 at p. 207 (1955 ed.)—and § 3321 (b) (1) of the Internal Revenue Code of 1939, by § 7301 of the same Internal Revenue Code of 1954.

Let us see now how the principles, established in the decision of *General Motors Acceptance* v. *Brañuela* (on reconsideration), on which decision the majority opinion seems still to rely in this case, have been evolving in the Puerto Rican case law. The next case is *Torres* v. *Buscaglia*, 68 P.R.R. 314, 316 (Todd, Jr.) (1948). This case deals with the forfeiture of an automobile belonging to appellant José A. Torres Plata, because said vehicle was surprised in Juana Díaz transporting two cans of distilled spirits on which the corresponding revenue had not been paid. The law applied to the case was § 62 (1) of the Spirits and Alcoholic Beverages Act of Puerto Rico—Act No. 6 of June 30, 1936, Sp. Sess. Laws, p. 44—which provided: "The Treasurer is hereby authorized to confiscate any vehicle, boat, launch, or other water or air craft which is apprehended loaded or while loading, transporting, carrying, or transferring any distilled spirits or alcoholic beverages illegally manufactured, imported, distilled, or rectified and on which the taxes prescribed by this Act have not been paid; and same shall be sold at public auction for the benefit of The People of Puerto Rico; *Provided*, That the Treasurer in his discretion may, if the public service so requires, designate not more than five (5) of such motor vehicles or boats to be used by duly authorized officials and agents of the Bureau of Alcoholic Beverages and Narcotics." And § 97 of the same Act which

provided: "Whenever the Treasurer of Puerto Rico is empowered by this Act to sell articles or products attached by him or by his agents, any aggrieved person may appeal to the corresponding district court, and said court shall have jurisdiction, after due hearing, to confirm, revoke, or modify the decision of the Treasurer. Said appeal shall be made within ten days after the interested person is notified."

The grounds of the appeal filed by Torres, according to the provisions of § 97 copied above, were the following: (1) that appellant had not committed any offense; (2) that the adequate proceedings were not followed, and (3) that his property had been subject to an arbitrary and unlawful forfeiture. Answering the assignment of errors, the opinion set forth: "The evidence, believed by the court, showed that appellant, at the request of the policeman who had seized the cans of rum that had been thrown out of appellant's automobile while it was driven by another person, took the car to headquarters voluntarily. . . .

"In *General Motors Acceptance Corp.* v. *Brañuela,* 60 P.R.R. 680; 61 P.R.R. 701, we held that confiscations authorized under § 62, *supra,* do not violate the constitutional guarantee of due process of law, inasmuch as § 97 gives the owner or person interested in the confiscated vehicle ample and sufficient opportunity to be heard.

". . . Appellant contends that since the two cans of alcohol were not seized inside the automobile, the latter can not be confiscated. The facts as proved show that when appellant's automobile was pursued by a motorcycle policeman, two cans were thrown out to the ditch and that when they were seized they contained alcohol. Section 62, *supra,* authorizes the forfeiture of any vehicle which is apprehended 'loaded or while loading, transporting, carrying, or transferring any distilled spirits or alcoholic beverages, etc.' Since the lower court believed the testimony of the policeman that

he noticed when the cans were thrown out while the car was running, we must conclude that said cans were being transported, carried and transferred in the vehicle."

Next case is *Martínez* v. *Buscaglia*, 69 P.R.R. 406, 407 (De Jesús) (1948). According to § 62 of Act No. 6 of 1936, previously copied, the Treasurer of Puerto Rico seized a motor vehicle used to transport alcoholic beverages, on which no internal revenue had been paid. The owner of the vehicle appealed to the lower court to set aside the forfeiture, according to the ruling in *People* v. *Decós*, 62 P.R.R. 140 (Todd, Jr.) (1943), in which case it was held that the search of an automobile was illegal if it was carried out without a search warrant and without probable cause for the search. In the *Martínez* case the Treasurer admitted the illegality of the search but alleged that that circumstance did not affect the validity of the forfeiture. According to Mr. Justice Todd, Jr., the question for decision boils down to determining whether the search being illegal, the order of forfeiture is void.

The opinion begins by explaining that: ". . . we should bear in mind that we are not dealing with a criminal case where a judgment based in whole or in part on evidence illegally obtained, and timely objected to, should be reversed. On the contrary, we are reviewing a decision rendered in a proceeding *in rem* where the personal rights of the owner of the thing are not invaded. Consequently, the constitutional clause against unlawful searches is not involved. *Boyd* v. *United States*, 116 U.S. 616, 623 (1886). This point, although novel in this jurisdiction, was decided more than a century ago by the Supreme Court of the United States through Mr. Justice Story in *The Caledonian* case, 4 Wheat. 99 (U.S. 1819), 4 L.Ed. 523, where it was said that either by the maritime law or by the general common law, any person may seize any property forfeited to the use of the government; that if it proceeds to enforce the forfeiture,

it sufficiently makes the search and seizure valid in law even if they had been illegal and said confirmation acts retroactively, that is to say, it is as if the search and seizure had been carried out under legal authority."

Next case is *General Motors Acceptance Corporation* v. *District Court*, 70 P.R.R. 898, 900 (Marrero) (1950); (on reconsideration) 70 P.R.R. 902 (1950). In an affidavit in a proceeding for repossession and delivery of personal property sold under conditional sales contract, the General Motors Acceptance Corporation asked for the repossession of an automobile which The People of Puerto Rico had seized because said automobile was transporting material and implements used in connection with the prohibited game of the bolita. The lower court permitted the intervention of The People of Puerto Rico and also dismissed the repossession.

The law applied was § 5 of Act No. 220 of May 15, 1948 (Sess. Laws, pp. 738, 742) which provided: "All devices, vehicles or other means of transportation, coin or other tools and implements used for and utilized in connection with the prohibited games of *bolita, bolipul,* clandestine combinations connected with the pools or *bancas* of the racetracks of Puerto Rico and clandestine lotteries which may have been seized in connection with said games, shall be forfeited to the People of Puerto Rico, and shall be sold by order of the proper court or tribunal, through the marshal thereof, in public sale and to the highest bidder."

Deciding the alleged errors of the lower court, this Court relying on the reasoning of *General Motors Acceptance* v. *Brañuela,* stated: "The confiscation proceeding is directed against the vehicle itself and not against its owner and . . . therefore the rights that upon said vehicle could be had by innocent third parties are not protected, except in those cases in which it is proved that the possession of the vehicle has been obtained by the violator without the express or implied

consent of the owner or of third innocent parties, as happens when the vehicle has been stolen. . . .

"In forfeiture proceedings notice to the owner of the vehicle and an opportunity to be heard are essential. . . . Herein, § 5 of Act No. 220, *supra*, does not specify in detail the procedure to be followed for the forfeiture nor whether any person should be notified or given an opportunity to be heard. The most important requisite in the statute is that it must be shown that the vehicle was utilized in connection with the prohibited games of *bolita* or *bolipool*. However, in order to attain this, notification and the opportunity to be heard are always enjoyed by the parties under our law, inasmuch as in harmony with the provisions of § 107 of the Code of Criminal Procedure 'The prosecuting attorney shall prosecute . . . all cases for . . . forfeitures accruing to The People of Puerto Rico within his district.' In such forfeiture proceedings the person in possession of a vehicle at the time of the seizure as well as any others who may have an interest therein must necessarily be notified and heard. Section 5 of Act No. 220 and § 107, *supra*, being *in pari materia* must undoubtedly be construed jointly. Section 18 of the Civil Code, 1930 ed. By virtue of the intervention requested by The People in the repossession proceeding, petitioner herein is already aware that the vehicle sold under a conditional sale by its assignor Caribe Motors Corp. has been seized by The People and is subject to a forfeiture proceeding. When after the termination of the criminal action the district attorney, pursuant to § 107, *supra*, brings proceedings for the forfeiture of the vehicle, the petitioner shall, as an interested party, have the opportunity to be heard in connection with any alleged right whatsoever thereon."

On reconsideration the previous statement is reaffirmed that: "Proceedings will commence as soon as the criminal action closes in the court taking original cognizance thereof,

without waiting for the final outcome of the appeal that might be taken, and will be filed in a competent court by reason of the amount involved . . . ."

The next case is *Sánchez* v. *Treasurer*, 72 P.R.R. 127, 129 (De Jesús) (1951). The owner of an insured public automobile while traveling from Cordillera to Ciales took a passenger who was carrying several packages and motioned to him to put the packages on the floor of the car, where the back-seat passengers rest their feet. Shortly thereafter, the police stopped the automobile and upon searching the packages brought along by the passenger, they found that the packages contained bootleg rum without the excise tax imposed by the Spirits and Alcoholic Beverages Act of 1936 having been paid.

The law applied was § 62 of Act No. 6 of 1936, as amended by Act No. 244 of May 12, 1945, which provided: "The Treasurer is hereby authorized to confiscate any vehicle, boat, motor launch, horse, beast, or any water or air craft which is apprehended loaded or while loading, unloading, transporting, carrying, or transferring any distilled spirits or alcoholic beverages illegally manufactured, imported, distilled, or rectified and on which the taxes prescribed by this Act have not been paid; and the same shall be sold at public auction for the benefit of The People of Puerto Rico, *Provided*, That the Treasurer in his discretion may, if the public service so requires, designate such vehicles, boats, motor launches, or horses as he may deem necessary for the official use of the officers or employees duly authorized by the Department of Finance."

The Treasurer ordered the confiscation of the vehicle and the owner filed suit in the lower court seeking to set aside the confiscation decreed by the Treasurer; and said court, after a trial on the merits, granted the complaint and consequently decreed the return of the vehicle because the

owner and driver of the vehicle had no knowledge or participation in the transportation of the liquor. This decision was affirmed by this Court because: ". . . the confiscation proceeding referred to in § 62 above mentioned is directed against the vehicle itself and not against its owner or the persons who might have some right over it, that the rights of the owner and of the third innocent parties are not protected against the seizure, except in those cases in which it is proved that the possession of the vehicle was obtained by the violator of the law, without the express or implied consent of the owner or third innocent party. In other words, that if the owner or the third innocent party directly, or indirectly has placed the vehicle in the possession of the violator, the rights of the former, although personally innocent of the violation, are affected adversely by the use which may be given to the vehicle by the person to whom it was entrusted. A *contrario sensu*, if the person in charge of the vehicle is not guilty of the violation, confiscation does not lie to the prejudice of the owner or third party innocent claimant.

"Despite the difference between the facts of this case and *General Motors Acceptance* v. *Brañuela, supra*, the doctrine established in the latter case gives us the necessary light to solve the problem now under our consideration. It is evident, we think, that if confiscation does not lie when neither the person entrusted with the vehicle nor the claimant has knowledge or reason to know the illegal use given to the vehicle, confiscation should likewise not lie when the person entrusted with the vehicle is the owner himself who is not guilty of the violation, as occurred here. We think it is desirable to state that the guilt or innocence of the person in charge of the automobile is a question of fact which must appear from the evidence."

The case that follows, concerning the legality of the confiscations, is *Metro Taxicabs* v. *Treasurer*, 73 P.R.R. 164, 172

(Negrón Fernández) (1952). Certain internal revenue agents surprised a taxi belonging to the Metro Taxicabs, Inc., transporting alcoholic beverages on which the corresponding internal revenue tax had not been paid. The Treasurer of Puerto Rico proceeded to confiscate said vehicle pursuant to the provisions of § 62 of Act No. 6 of June 30, 1936, as amended by Act No. 244 of May 12, 1945, copied above. The lower court reversed the decision of the Treasurer and ordered the return and delivery of the vehicle to Metro Taxicabs, Inc. This Court reversed because it concluded that the two premises on which the judge of the lower court based his findings of fact to order the return, to wit, (1) that the case dealt with a larceny of use of the vehicle inasmuch as the person in charge thereof at the time of the confiscation took possession by means of deceit and trickery without the knowledge or authorization of plaintiff, and (2) in reaching the implied conclusion that Metro Taxicabs, Inc., was an innocent third party [were erroneous]. This Court in deciding the two premises of fact made the following analysis of the proof:

"Based on these facts, it is easy to note that the conclusion of the lower court, in the sense that 'This case practically deals with theft of the use of the taxi'—after stating 'As a matter of fact, therefore, the use or possession of the taxicab by Ángel Gómez Gutiérrez was illegal and unauthorized'—is erroneous. The vehicle was in Alicea's possession, plaintiff's employee, and Gómez came into its possession with Alicea's authorization, who gave it to Gómez so that he would go to 'take up a fare.' Disregarding now the explanation that Alicea gave to the Manager-treasurer as to what happened, see footnote 4, Alicea's own testimony reveals that when Gómez returned with the 'smuggled rum' inside the car to the place where the former had stayed drinking coffee while waiting for him, Alicea got into the car 'because he had to deliver the car,' notwithstanding that he had noticed that the car was 'loaded with rum.' Although when the trial judge asked him 'Did you protest or not?' he

answered 'Yes,' he did not state however, in what consisted his protest nor how he had manifested it. On the contrary, his own testimony reveals his consent—having already knowledge of the existence of the smuggling—in allowing Gómez to continue in possession and control of the vehicle thereafter allowing it to be used in the transportation of clandestine rum.

"According to Alicea's testimony—on which the trial judge bases all his findings of fact—and without considering other particulars which arise from the rest of plaintiff's evidence, it is obvious that this case deals, at most, with the unauthorized use of a vehicle by the employee to whom it was entrusted, who delivered it to, and consented and allowed another person to use it unlawfully. That circumstance, however, does not protect plaintiff. In such situation the rule set forth in *General Motors Acceptance* v. *Brañuela,* 61 P.R.R. 701, in the sense that 'if the owner or the third innocent party directly or indirectly has placed the vehicle in the possession of the violator or of the person under whose orders he acts, the rights of the owner or of the third innocent party, under such circumstance, run the risk that goes along with whatever use to which the one in possession dedicates the vehicle,' is clearly in point."

The next case argued is *Stuckert Motor Co.* v. *District Court,* 74 P.R.R. 494 (Snyder) (1953), which refers to a complaint filed in the former District Court by Stuckert Motor Company against The People of Puerto Rico for the seizure of a Studebaker, belonging to a corporation, for a violation of § 37 of Act No. 17 of January 19, 1951, as amended by Act No. 397 of May 10, 1951, in the sense that "Whenever an insular policeman or public peace officer surprises any person in the act of transporting on any mount or vehicle any weapon in violation of this Act, it shall be the duty of such officer to seize all weapons so found and transported in violation of law. When such weapons unlawfully transported or possessed are seized by a public peace officer, the said officer shall take possession of the mount or vehicle, and shall arrest the person in charge of same, to answer for the offense committed.

"The Attorney General is hereby authorized to confiscate any mount or vehicle so seized, and to sell the same at public sale for the benefit of The People of Puerto Rico. The proceedings for the confiscation of any property under the provisions of this section shall be prosecuted in the district of the District Court of Puerto Rico properly taking cognizance of the criminal proceedings whether originally or on appeal, and the proceedings shall be begun upon the seizure by the Attorney General of the property object of the confiscation. The owners of the property so seized, or those in charge thereof, or those who may have known right or interest in same shall be served notice by mail, if their addresses are known, and they may challenge the confiscation within the fifteen (15) days following the date notice is served on any of them in an action against The People of Puerto Rico, without giving of bond, notice of which action shall be served on the Attorney General, and the latter shall file his allegations within the ten (10) days following such service of notice. The trial shall be heard out of calendar and against the judgment entered there shall be no remedy other than certiorari before the Supreme Court, limited to issues of law. Notice by mail on the owners, persons in charge, and other persons having a known right or interest in the property seized shall be understood to have been served upon the mere placing thereof in the mails."

In the case it was indicated that there was a possible similarity in the juridical context of our § 37, with § 26 of the National Prohibition Act which provided:

"Section 26.—When the commissioner, his assistants, inspectors, or any officer of the law shall discover any person in the act of transporting in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or air craft, or other vehicle, it shall be his duty to seize any and all intoxicating liquors found therein being transported contrary to law. Whenever intoxicating liquors transported or possessed illegally shall

be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof. Such officer shall at once proceed against the person arrested under the provisions of this title in any court having competent jurisdiction; but the said vehicle or conveyance shall be returned to the owner upon execution by him of a good and valid bond, with sufficient sureties, in a sum double the value of the property, which said bond shall be approved by said officer and shall be conditioned to return said property to the custody of said officer on the day of trial to abide the judgment of the court. The court upon conviction of the person so arrested shall order the liquor destroyed, and unless good cause to the contrary is shown by the owner, shall order a sale by public auction of the property seized, and the officer making the sale, after deducting the expenses of keeping the property, the fee for the seizure, and the cost of the sale, shall pay all liens, according to their priorities, which are established, by intervention or otherwise at said hearing or in other proceeding brought for said purpose, as being bona fide and as having been created without the lienor having any notice that the carrying vehicle was being used or was to be used for illegal transportation of liquor, and shall pay the balance of the proceeds into the Treasury of the United States as miscellaneous receipts. All liens against property sold under the provisions of this section shall be transferred from the property to the proceeds of the sale of the property. If, however, no one shall be found claiming the team, vehicle, water or air craft, or automobile, the taking of the same, with a description thereof, shall be advertised in some newspaper published in the city or county where taken or if there be no newspaper published in such city or county, in a newspaper having circulation in the county, once a week for two weeks and by handbills posted in three public places near the place of seizure, and if no claimant shall appear within ten days after the last publication of the advertisement, the property shall be sold and the proceeds after deducting the expenses and costs shall be paid into the Treasury of the United States as miscellaneous receipts,"

this Court holding that "Despite the similarity in language between § 26 of the National Prohibition Act and § 37

of our Weapons Law, we do not regard the cases under the former as controlling in the matter before us. In the first place, inasmuch as the Prohibition Act presented many peculiar problems, the cases decided under it frequently are inapplicable in other fields. In the second place, the Federal courts were constantly plagued during the prohibition era with the problem of whether forfeiture of a vehicle should be under the tax laws or under § 26 of the Prohibition Act. This was important as the former did not, as did § 26, protect the interests of innocent lienors or owners. . . . The government therefore usually argued—at times successfully —that no person was apprehended in the act of transporting intoxicating liquor in a vehicle in order to bring the action under the tax laws rather than the Prohibition Act to the prejudice of innocent owners or lienors. But here we have a state statute where no such choice has to be made in the different field of enforcement of the Weapons Law."

Concerning any aspect related to the scope of illegality of the seizures, the next case is *Downs* v. *Porrata*, 76 P.R.R. 572, 578–79 (Belaval) (1954). An information was filed by the prosecuting attorney of the former District Court of Puerto Rico, Arecibo Part, against Robert H. Downs, a member of the United States Armed Forces, for violation of §§ 7 and 29 of Act No. 17 of January 19, 1951, previously cited, and upon being arrested a motorcycle belonging to him was seized, presumptively used for the illegal transportation of a prohibited weapon. The Honorable Governor of Puerto Rico granted plaintiff a pardon and the latter requested the return of the motorcycle. The only question submitted in the proceeding in this court was to determine the effect of an absolute full and unconditional pardon on any seized or forfeited property employed in the commission of the offense.

The prosecuting attorney moved this Court to apply to the case the theory of the guilt on the thing and that we

declare that since the confiscation proceeding is one *in rem*, directed to the vehicle itself and not to its owner, any pardon granted to the owner does not reach the thing. This Court decided against the motion of the prosecuting attorney on the following grounds:

"The sometimes useful fiction that the guilt may fall on the thing serving as instrument for the commission of an offense, excluding the criminal will which directs it, does not have an absolute value on which the decision of the instant case must depend. The nature of an *in rem* or *in personam* proceeding depends for its utility on the aim of the statute. Sometimes an Act, as happens in § 34 of the Weapons Act of Puerto Rico, as amended by Act No. 129 of April 22, 1952 . . . declares certain instruments a public nuisance, which because of their extreme danger to the State, are ministerially forfeited as soon as seized, for possible legal use by the State or for definite destruction. At other times, as in § 37 of the same law, as amended by Act No. 397 of May 10, 1951, it merely provides for the seizure of certain instruments, which although they may be employed for lawful purposes, become unlawful instruments because of the use given to them by the offender. In the first case, the confiscation is automatic and the title passes directly to the State, and the judicial declaration of guilt automatically entails the forfeiture of the thing without taking into consideration any interests other than those of the State. In the second case the confiscation has to be made by judicial declaration after proving (1) the unlawful use of a thing and (2) the knowledge of the interested parties of such unlawful use. The title does not pass to the State or to the person who acquires it in the judicial sale until there is a judicial declaration and the public auction has been accomplished. We must not look to the nature of the action, but to the true purpose of the statute, in confronting a situation like the one herein."

The opinion in the *Downs* case continues: "We are not dealing here with a thing of extreme danger which has been legislatively declared a public nuisance. We agree with defendant that a pardon does not reach the remission of property which could cause injury to the State. But when it is the case, as here, of useful property, which may be employed for a lawful purpose, such as vehicles and mounts, where the law also recognizes the right of innocent persons to claim the thing, the practical effect of the pardon is, that on blotting out the person's guilt, the confiscated property automatically becomes innocent property which can be returned to its owner, since the guilt of the owner is what makes it an unlawful instrument or means for the commission of an offense. At any rate the executive would always have the opportunity to set forth in the pardon itself, as a condition to be fulfilled by the person pardoned, the disposition of any property connected with the commission of the offense."

Another case covered in this study is *Commonwealth* v. *Superior Court*, 76 P.R.R. 789, 792 (Negrón Fernández) (1954). The facts which gave rise to the seizure were the following: Elsie Torres was owner of an automobile, license plate P-49-530, engaged in the transportation of passengers for hire, driven by Adam Colón, an employee of Elsie Torres. In the evening of the confiscation, the aforesaid driver was going to Bar Sinaola, situated in the Maragüez road, a barrio of Ponce, for the purpose of transporting to Ponce, for hire, Humberto Zengotita, owner of the aforesaid bar. On the way to that establishment, chauffeur Adam Colón and two passengers named Jesús Feliciano Montero and Carlos Villanueva engaged in an argument. In order to avoid an accident, the driver took away from Feliciano Montero a revolver which he was carrying unlawfully keeping it for several minutes, but returning it to Feliciano upon his insistence. At 1:00 a.m., Humberto Zengotita as well as

Feliciano, Carlos Villanueva, and two unidentified women boarded the same automobile which Adam Colón was driving to Ponce. Another argument ensued on the way, this time between Villanueva and chauffeur Colón. At Villanueva's request, Colón stopped the car. Villanueva and the chauffeur got out, the latter insisting on fighting Villanueva. At that time an automobile that was coming stopped at the signal made by Villanueva, from which corporal Pierantoni alighted. He searched chauffeur Colón, but found no weapon, but upon noticing that Feliciano was taking out a revolver from under his shirt and putting it on the rear seat of the automobile, he confiscated the weapon. The trial judge found that chauffeur Adam Colón was not surprised by Corporal Pierantoni in the act of *carrying* a firearm and therefore the confiscation was not in order; that he was innocent of the violation of the law committed when a weapon was found in the vehicle which he was operating; that if there was any possession on his part, the same was incidental in order to avoid a tragedy, and that since the automobile was devoted to public service at the time the weapon was confiscated, there was no presumption of unlawful possession of the weapon by the other persons occupying the vehicle, in the light of § 14 of the Weapons Act.

The statute applied by the former District Court, as may be seen, was § 14 of Act No. 17 of January 19, 1951 (Sp. Sess. Laws, p. 426) as amended by Act No. 397 of May 10, 1951 (Sess. Laws, p. 992), which provided: "The presence in a vehicle other than a public service vehicle at the time transporting passengers for pay, of any of the weapons, instruments, or appliances of the kind specified in Sections 4, 5, 6, 9 and 10 of this Act shall be prima facie evidence of their unlawful possession by all the persons occupying said vehicle at the time such weapons, instruments or appliances are found, *except, in the case of a public service vehicle, which*

*at that time is transporting passengers for pay.** Where one of the persons found in such vehicle is the one carrying on his person such weapon, instrument, or appliance, and said person possesses with him a valid license to carry the weapon, instrument, or appliance so found, and he is not there under duress, said presumption of unlawful possession shall not attach to the other persons found in such vehicle. Nothing in this section contained shall apply to public officers, police, soldiers, or persons authorized by this Act to carry weapons by reason of their office."

The Court reversed the decision of the lower court on the following grounds: ". . . Although chauffeur Colón did not carry on his person the revolver at the time it was seized by Corporal Pierantoni, the fact is that his knowledge that Feliciano was unlawfully carrying a weapon made him a coparticipant of the unlawful act of the transportation. The exception made in § 14 is for the benefit of those persons who, when using a public vehicle, are unaware of the fact that a prohibited weapon is being illegally transported therein by someone. But that exception merely excludes them from the *prima facie* evidence rule—which we are not considering here —for purposes of the criminal prosecution against them. This is a proceding directed against a vehicle used as a means for the unlawful transportation of a weapon.

"The forfeiture of a vehicle used in the transportation of a firearm under § 37 of the Act is an action *in rem* addressed against the vehicle itself and not against the owner or his agent. [Citations.] The fact that the chauffeur of the vehicle did not carry on his person or transport a revolver for his own purposes, is no defense against a forfeiture of the means used for the transportation."

---

* Editor's Note: The lines in italics have been omitted, I presume, inadvertently, in the English version of the Act—No. 17 of January 19, 1951 (Sp. Sess. Laws, p. 426).

The penultimate case which we should consider is *Ochoteco* v. *Superior Court*, 88 P.R.R. 500, 502, 503 (Santana Becerra) (1963). The facts stipulated show that on February 3, 1961, between half past ten and eleven o'clock at night, on Ponce de León Avenue, Santurce, members of the State Police proceeded to seize and confiscate an automobile belonging to plaintiff Carlos M. Ochoteco, because on said day and while the automobile was occupied by Daniel Domingo Núñez Mojica, who was driving it, and Jesús Negrón Machuca, Reinaldo Pagán García, and José González Rodríguez, they found within the vehicle and not on any of the aforesaid persons, a Colt revolver, 38 caliber, registered in the name of Ramón Quiñones López, who had informed the detective that the same had disappeared from his residence, and a pistol which it was not known on whose name it was registered. From the stipulations of fact it appears that at five o'clock in the afternoon of the same February 3, 1961, plaintiff Carlos M. Ochoteco ordered the chauffeur Daniel Domingo Núñez Mojica, who was plaintiff's employee in the business of the sale of blinds, doors, and awnings, situated in Cataño, Puerto Rico, to proceed to load the vehicle, as he did, with blinds to be used in a house under construction by Rafael Torrech Ríos in the ward Juan Sánchez of Bayamón; that plaintiff Carlos M. Ochoteco gave express instructions to his employee of using said vehicle exclusively to go to his residence in the ward Pueblo Viejo of Guaynabo, and once he reached his residence, not to use the vehicle in question until early in the morning of Saturday the 4th, 1961, when he should take, unload, and deliver the blinds at the aforesaid house under construction of Rafael Torrech Ríos; that after the employee arrived at his residence in Barrio Pueblo Viejo, the chauffeur Daniel Domingo Núñez Mojica proceeded to unload the blinds and invited Jesús Negrón Machuca, Reinaldo Pagán García, and José González Rodríguez to go and to have a good time, which they did, accompanied

by streetwalkers and visiting several paradises of amusement, taking intoxicating liquors and dancing; that while they were enjoying themselves in the manner and on the day, hour, and places aforesaid, they were stopped for an alleged violation of the Traffic Act, the above-mentioned weapons being seized and the said occupants being arrested, plaintiff herein not being among them at any time, nor the aforesaid cargo.

The lower court concluded, as a question of law, in order to refuse the return of the automobile because its confiscation had been illegal, that: "Although plaintiff's contention is full of logic, yet, according to the state of the decisions in our jurisdiction, every proceeding involving the confiscation of a vehicle, being directed against the latter and not against its owner, is a proceeding 'in rem,' wherefore the rights of third innocent parties are neither involved nor protected," citing the cases of *General Motors Acceptance* v. *Brañuela* (on reconsideration), *General Motors Acceptance* v. *District Court, Stuckert Motor* v. *District Court, Downs* v. *Porrata,* previously cited.

This penultimate case contains an analysis of our decisions scrupulously and carefully made, with the intention of showing that our decisions have tried to protect the rights of third innocent parties. Let us see what Mr. Justice Santana Becerra said on this point: "In the light of our decisions, even though they have followed a restrictive criterion in favor of confiscation, we cannot agree with the trial court that the only answer in situations such as these is the fact that the action is directed against the thing *'res,'* so that the rights of innocent third parties are neither involved nor protected. Such generalization of the applicable rule of law is not proper in all cases. Each case must be examined and weighed in the light of its own facts, since the nature *'in rem'* of the action does not divest it of its essentially punitive condition and of

inflicting punishment. The prevailing principle herein is clear, which we do not alter at all, that one who grants or delivers the possession of a vehicle ordinarily assumes the risk of the illegal use to which it may be devoted. However, not every delivery of the possession has similar motivations, nor identical justification, nor the same necessity, nor similar purposes. This case must be decided on its own facts. According to the facts stipulated, it involves the possession made necessary for business purposes."

The last decision of our case law which we will cite is *Meléndez* v. *Superior Court,* 90 P.R.R. 639, 646-647 (Ramírez Bages), (Negrón Fernández), (Belaval—Hernández Matos—Santana Becerra), (Blanco Lugo—Pérez Pimentel—Rigau—Dávila, and Ramírez Bages) (1964).

According to the findings of fact of the trial judge, Juan R. Meléndez sold on conditional sale to Carlos M. Ortiz a 1958 Chevrolet, which on June 27, 1962 had not been paid in full; that on that date and while said vehicle was being driven by Anastacio Cintrón Torres, and riding therein also the conditional purchaser Carlos M. Ortiz, an accident took place in which said motor vehicle was involved and when the police intervened they seized inside the vehicle an instrument described in the police report as a whip. When the conditional vendor requested the return of the vehicle in order to collect the unpaid instalments of its conditional sale, the trial court concluded that since the instrument seized was similar to a blackjack, the same was a prohibited weapon and its seizure within said vehicle entailed the confiscation of the vehicle, denying the return requested.

The laws applicable to the legality of the confiscation in this case are the following: Section 37 of Act No. 17 of January 19, 1951, as amended by Act No. 39 of June 4, 1960, provides that: "The Secretary of Justice shall seize any vehicle, mount, vessel, or plane which loads, unloads,

transports, carries, or transfers, or which is used for loading, unloading, transporting, carrying, or transferring; or which is caught loaded, or in the act of loading, unloading, transporting, carrying, or transferring, any weapon in violation of this chapter. For the seizure and disposal of vehicles, mounts, vessels, or planes, there shall be followed the same procedure established by the act known as Uniform Vehicle, Mount, Vessel, and Plane Seizure Act," and § 2 of Act No. 39 of June 4, 1960, as amended by Act No. 10 of September 1, 1961, which provides:

"Section 2.—Whenever any vehicle, mount, vessel, or plane is seized pursuant to the provisions of Act No. 6 of June 30, 1936, Act No. 220 of May 15, 1948, Act No. 17 of January 19, 1951, Act No. 48 of June 18, 1959, and/or Act No. 2 of January 20, 1956, such seizure shall be conducted as follows:

"(a) The proceeding shall be begun by the seizure of the property by the Secretary of Justice, the Secretary of the Treasury or the Police Superintendent, through their delegates, policemen or other peace officers. The officer under whose authority the action is taken shall serve notice on the owner of the property seized or the persons in charge thereof or any person having any known right or interested therein, of the seizure and of the appraisal of the properties so seized, said notice to be served in an authentic manner within ten (10) days following such seizure and such notice shall be understood to have been served upon the mailing thereof with return receipt requested. The owners, persons in charge, and other persons having a known interest in the property so seized may challenge the confiscation within the fifteen (15) days following the service of the notice on them, through a complaint against the officer under whose authority the confiscation has been made, on whom notice shall be served, and which complaint shall be filed in the Part of the Superior Court corresponding to the place where the seizure was made and shall be heard without subjection to docket. All questions that may arise shall be decided and all other proceedings shall be conducted as in an ordinary civil action. Against the judgment entered no remedy shall lie other than a certiorari before the Supreme Court, limited to issues of

law. The filing of such complaint within the period herein established shall be considered a jurisdictional prerequisite for the availing of the action herein authorized.

"(b) Every vehicle, mount, or any vessel or plane so seized shall be appraised as soon as taken possession of by the officer under whose authority the seizure took place, or by his delegate, with the exception of motor vehicles, which shall be placed under the custody of the Office of Transportation of the Commonwealth of Puerto Rico, which shall appraise same immediately upon receipt thereof.

"In the event of a judicial challenge of the seizure, the court shall, upon request of the plaintiff and after hearing the parties, determine the reasonableness of the appraisal as an incident of the challenge.

"Within ten (10) days after the filing of the challenge, the plaintiff shall have the right to give bond in favor of the Commonwealth of Puerto Rico before the pertinent court's clerk to the satisfaction of the court, for the amount of the assessed value of the seized property, which bond may be in legal tender, by certified check, hypothecary debentures, or by insurance companies. Upon the acceptance of the bond, the court shall direct that the property be returned to the owner thereof. In such case, the provisions of the following paragraphs (c), (d) and (e) shall not apply.

"When bond is accepted the subsequent substitution of the seized property in lieu of the bond shall not be permitted, said bond to answer for the seizure if the lawfulness of the latter is upheld, and the court shall provide in the resolution issued to that effect, for the summary forfeiture execution of said bond by the clerk of the court and for the covering of such bond into the general funds of the Government of Puerto Rico in case it may be in legal tender or by certified check; the hypothecary debentures or debentures of insurance companies shall be transmitted by the pertinent clerk of the court to the Secretary of Justice for execution.

"(c) After fifteen (15) days have elapsed since service of notice of the seizure without the person or persons with interest in the property seized have filed the corresponding challenge, or after twenty-five (25) days have elapsed since service of notice of the seizure without the court's having directed that the

seized property be returned on account of the bond to that effect having been given, the officer under whose authority the seizure took place, the delegate thereof, or the Office of Transportation, as the case may be, may provide for the sale at auction of the seized property, or may set the same aside for official use of the government of Puerto Rico. In case the seized property cannot be sold at auction or set aside for official use of the Government, the property may be destroyed by the officer in charge, setting forth in a minute which he shall draw up for the purpose, the description of the property, the reasons for its destruction and the date and place where it is destroyed, and he shall serve notice with a copy thereof on the Secretary of Justice.

"(d) In case the vehicle, mount, or vessel, or plane is sold at auction, the proceeds from the sale shall be covered into the general fund of the Government of Puerto Rico, after deducting and reimbursing expenses incurred.

"(e) If the seizure is judicially challenged and the court declares same illegal, the Secretary of the Treasury of Puerto Rico shall, upon presentation of a certified copy of the final decision or judgment of the court, pay to the challenger the amount of the appraisal or the proceeds from the public auction sale of such property, whichever sum is the highest, plus interest thereon at the rate of 6% per annum, counting from the date of the seizure."

On review this Court reversed the decision of the lower court as to the nature of the weapon seized and the vote was divided as to the legality of the seizure. The opinion of the writer, with whom Mr. Justice Hernández Matos and Mr. Justice Santana Becerra agreed, stated that: "The original source of this institution of law [seizure] is the principle consecrated by the English common law that the property unlawfully used by the offender to commit an offense did not pass to the Crown until a conviction of the user was had— 3 A.L.R.2d 740, § 2 (1949). Owing to this common-law background, in American law the so-called confiscation in rem is always made on the authority of an express statutory declaration, although, in the absence of such express declaration,

attempt is made to find such legislative intention in the general context of the law or in the scope or limitation of the remedies therein provided."

It continues: "What distinguishes a confiscation in rem from a confiscation in personam is that the former denies to the owner of the property, or to the possessor in charge thereof, or to any person having some legal interest thereto, every right to claim the property even if he can establish his innocence with respect to the illicit use made of the property. In the confiscation in personam, the right to claim the property is recognized to the above-named persons by establishing their innocence as to the illicit use, unless the thing involved is dangerous per se, as in the case of a deadly weapon or of a thing declared a public nuisance by the statute itself, as are implements used to counterfeit bills or print clandestine lotteries. As to the automatic seizure of a thing which is dangerous per se, see *Downs* v. *Porrata, Pros. Atty.*, 76 P.R.R. 572, 578–79 (Belaval) (1954)."

It continues: "Having examined Act No. 39 of 1960 in its entirety, we first notice the absence of an express declaration on the nature in rem of the authorized confiscation. Like every civil law bearing indirectly on the commission of an offense, its corrective purpose parts from the premise of a person guilty of its violation. As to the innocent parties, although there is no express exception in their favor, a proceeding of the nature of in personam is established in which 'The owners of the property so seized, those in charge thereof and those having any known right or interest therein shall be served notice of the seizure and of the appraisal . . . and they may challenge the confiscation . . . through a complaint against the Secretary of Justice or the Secretary of the Treasury . . . and all questions which may arise shall be decided and all other proceedings shall be conducted as in an ordinary civil action.' "

The opinion of Mr. Justice Blanco Lugo, with whom Mr. Justice Pérez Pimentel, Mr. Justice Rigau, Mr. Justice Dávila, and Mr. Justice Ramírez Bages agreed, stated that: "In *General Motors Acceptance* v. *Brañuela,* 61 P.R.R. 701, 705 (1943), we adopted the rule to the effect that 'the confiscation proceeding is directed against the vehicle itself and not against its owner and that therefore the rights that upon said vehicle could be had by innocent third parties are not protected, except in those cases in which it is proved that the possession of the vehicle has been obtained by the violator without the express or implied consent of the owner or of third innocent parties, as happens when the vehicle has been stolen.' We added that 'if the owner or third innocent party directly or indirectly has placed the vehicle in the possession of the violator or of the person under whose orders he acts, the rights of the owner or of the third innocent party, under such circumstance, runs the risk that goes along with whatever use to which the one in possession dedicates the vehicle.'

". . . . . . . .

"The situation of the averments in the case at bar does not warrant discussion of the legality of the confiscation. The question was not raised in the complaint because appellant merely alleged that 'a blackjack nor any other weapon of those specified in Act No. 17 of January 19, 1951, as amended, was not being carried, transported, borne, or transferred in the vehicle, and it is alleged on the contrary that what was seized in the vehicle was a whip, the confiscation being illegal and arbitrary.' The trial court rejected this contention, and it is precisely because in our opinion it is proper that we are reversing the judgment.

"Neither do the findings of fact permit a holding that the defense of innocent third party was raised. What is more, what they show is that at the time of seizing the whip the vehicle was operated by Anastacio Cintrón, 'and the condi-

tional vendee, Carlos M. Ortiz, was also riding therein.' From the foregoing the presumption would be that the owner of the automoblie had knowledge, and what is more controlling, that the vehicle was being operated with his consent. According to the doctrine in *Brañuela, General Motors*, and *Stuckert Motors Co.*, this knowledge would defeat any averment of innocent third party which the conditional vendor could have made."

It concludes: "Nor can I agree either that the absence in the Uniform Vehicle, Mount, Vessel and Plane Seizure Act, No. 39 of June 4, 1960, 34 L.P.R.A. § 1720 *et seq.*, of an express declaration on the nature in rem of the confiscation has the importance sought to be attributed to it. This measure is but a law of procedure. The authority for the confiscation continues to be the corresponding provisions of the Weapons, Bolita, Excise Tax, Beverages, and Drugs and Narcotics Acts which, as to the character and extent of the Secretaries of Justice and of the Treasury, as the case may be, have not changed substantially since the decision in *Brañuela*. I admit that Act No. 39 authorizes the challenge of the confiscation by an interested party, but this has always been so, and it has added nothing new to the state of the local law."

As to the in rem proceeding used in the confiscation of things employed in the commission of an offense, the question centers on three controversies which are produced quite frequently in such institutional law. It is a complex of provisions of Public International Law, Constitutional Law, Criminal Law, of procedural statutes which try to provide substantive rights which involve: (1) the nature of the confiscation proceeding; (2) the proscription of rights of innocent third parties as to the thing used in the commission of the offense; (3) the admissibility of evidence obtained in violation of the constitutional prohibitions. It is a complex of provisions difficult to isolate from each other as unilateral

propositions, but easy to understand upon being considered together from a historical-legislative radical. Let us see:

1—Subsequent to the case of *General Motors Acceptance Corp.* v. *Brañuela* (on reconsideration), which we have already cited at length, this Court decided the case of *Martínez* v. *Buscaglia, Treas.*, 69 P.R.R. 406 (1948), which upon dealing with the nature of the confiscation proceeding, refers to the case of *The Caledonian*, 4 Wheat. 99 (U.S. 1819), 4 L.Ed. 523. The decision of this last case is sufficiently brief and its content so characteristic of the time in which it is produced, that it is worthwhile to reproduce it wholly. Here it is:

"This is the case of an American ship which sailed from Charleston, S.C., with a cargo of rice, bound to Lisbon, about the 28th of May, 1813, under the protection of a British license. In the course of the voyage the ship was captured by a British frigate, and sent into Bermuda for adjudication. Upon trial she was acquitted, and her cargo being prohibited from exportation, was afterwards sold by the agent of the claimant at Bermuda and the proceeds were remitted for his use. The ship sailed from Bermuda for the United States, in November, 1813, and upon her arrival at Newport, in Rhode Island, was seized by the collector of that port as forfeited to the United States. The libel contains four articles propounding the causes of forfeiture; first, for the ship's having on board, and using a British license; second, for the ship's being engaged in trade with the enemy; and thirdly and fourthly, for using a British license contrary to the act of Congress of the 2d of August, 1813, ch. 56, prohibiting the use of British licenses.

"It is unnecessary to consider the two last articles which are founded upon statutable prohibitions, because, it is clear that the two preceding articles, founded on the general law of prize, are sufficient to justify a condemnation juri belli, the proof of the facts being most clearly established.

"The only questions which can arise in the case are whether the ship was liable to seizure for the asserted forfeiture, after her arrival in port and, if so, whether the collector had au-

thority to make the seizure. And we are clearly of opinion in favor of the United States on both points. It is necessary, to enable the government to enforce condemnation in this case, that there should be a capture on the high seas. *By the general law of war, every American ship sailing under the pass or license of the enemy, or trading with the enemy, is deemed to be an enemy's ship, and forfeited as prize.* If captured on the high seas, by a commissioned vessel, the property may be condemned to the captors as enemy's property; if captured by an uncommissioned ship, the capture is still valid, and the property must be condemned to the United States. But the right of the government to the forfeiture is not founded on the capture; *it arises from its general authority to seize all enemies' property coming into our ports during war*; and also from its authority to enforce a forfeiture against its own citizens, whenever the property comes within its reach. If, indeed, the mere arrival in port would purge away the forfeiture, it would afford the utmost impunity to persons *engaged in illegal traffic during war,* for in most instances the government would have no means of ascertaining the offense until after such arrival.

"In respect to the other point, it is a general rule that any person may seize any property forfeited to the use of the government, either by the municipal law or by the law of prize, for the purpose of enforcing the forfeiture. And it depends upon the government itself, whether it will act upon the seizure. If it adopts the acts of the party, and proceeds to enforce the forfeiture by legal process, this is a sufficient recognition and confirmation of the seizure, and is of equal validity in law with an original authority given to the party to make the seizure. The confirmation acts retroactively, and is equivalent to a command." (Italics ours.)

As may be seen, the precedent of *The Caledonian* was taken from a poorly-defined extraterritorial practice, within the law of the people as well as within the secular maritime uses, employed to come to terms with the enemy in case of war, and as such, without any need of justifying its juridical sense as a rule acceptable to the peaceful life of a community, if it had to be applied to the violations of an internal revenue law. From there we translated to our judicial dis-

sertation the principle that if the government proceeds to confiscate any property, the mere fact of confiscation would render valid the search as well as the seizure, even though the latter should be illegal. This explains the strictness attached to the analogies when translated to our internal revenue laws.

Upon reading together the first provision in the federal statutes as to the confiscation for tax evasion—§ 3450 of the Compilation of Revised Statutes of the United States, which provides: "That in case any goods or commodities for or in respect whereof any tax is or shall be imposed, or any materials, utensils, or vessels proper or intended to be made use of for or in the making of such goods or commodities shall be removed, or shall be deposited or concealed in any place, with intent to defraud the United States of such tax, or any part thereof, all such goods and commodities . . . shall be forfeited; and in every such case . . . all and singular the casks, vessels, cases, or other packages whatsoever . . . respectively, and every vessel, boat, cart, carriage, or other conveyance whatsoever, and all horses or other animals, and all things used in the removal or for the deposit or concealment thereof, respectively, shall be forfeited" and § 62 of Act No. 6 of June 30, 1936 of Puerto Rico, which provides: "The Treasurer is hereby authorized to confiscate any vehicle, boat, launch, or other water or air craft which is apprehended loaded or while loading, transporting, carrying or transferring any distilled spirits or alcoholic beverages illegally manufactured, imported, distilled or rectified and on which the taxes prescribed by this Act have not been paid; and same shall be sold at public auction for the benefit of The People of Puerto Rico; *Provided*, That the Treasurer in his discretion may, if the public service so requires, designate not more than five (5) of such motor vehicles or boats to be used by duly authorized officials and agents of the

Bureau of Alcoholic Beverages and Narcotics" it is discovered that there is no legislative pronouncement as to the nature, scope and effects of the confiscation, outside of the literal and simple meaning of the word, nor any legislative description of the proceeding to be followed, with the exception of the bare reference to the public sale contained in the Puerto Rican law.

Contrary to what may be supposed, to consider the confiscation of the thing used in an offense as an in rem proceeding as accepted in our decisions, is not a legislative rule translated from one jurisdiction to another, but a judicial pronouncement of the United States Supreme Court, originally accepted by our Court as a compulsory precedent and later followed as a reliable rule within the judicial deferences, which pronouncement was to collide, in the course of years, not only with the system of the constitutional prohibitions, but also with a new concept of a less vindicative penalty.

From the survey we have made of the case law, federal as well as Puerto Rican, it may be concluded that from the decision of the *Dobbins* case until the decision of the *One 1958 Plymouth Sedan* case, any judge in Puerto Rico could have used the *Dobbins* rule or the *Boyd* rule, and according to his particular penological preference, declare the confiscation proceeding of the things used in the commission of an offense as an in rem proceeding with all the rights of innocent property attached thereto, or as an in personam proceeding of a criminal nature, with all the rights of the innocent property saved until it is proved by the State that owners or possessors of the rights and liens knew or accepted the criminal offense, thereby becoming coparticipants in the offense and then, the confiscation of the things used in the commission of the offense would become part of the penalty, always subject, as any other penalty, not to exceed the limit imposed by the Constitution, of the United States as well

as the Commonwealth, to avoid cruel and unusual punishment, as reads the noble warning of Mr. Justice Goldberg in the case of *One 1958 Plymouth Sedan.*

As it will be remembered, as to the confiscation of goods or property used in the commission of an offense, even in cases in which the theory of the in rem nature of the confiscations is applied, denying protection to the innocent interest, as in the case of Goldsmith, Mr. Justice McKenna saved for the future the lack of proportion between the penalty and the offense committed: "It is said that a Pullman sleeper can be forfeited if a bottle of illicit liquor be taken upon it by a passenger, and that an ocean steamer can be condemned to confiscation if .a package of like liquor be innocently received and transported by it. Whether the indicated possibilities under the law are justified we are not called upon to consider."

In the case of *One 1958 Plymouth Sedan,* the United States Supreme Court explains the cases of automatic seizure of objects, the possession of which, without more, constitutes an offense, answering to the objections of the State in the following manner: "The Commonwealth further argues that *Boyd's* unequivocal statement that the Fourth Amendment applies to forfeiture proceedings as well as criminal prosecutions has been undermined by the statements of this Court in *United States* v. *Jeffers,* 342 U.S. 48, 54 [96 L.Ed. 59, 65] and *Trupiano* v. *United States,* 334 U.S. 699, 710 [92 L.Ed. 1663, 1671]. *Jeffers* and *Trupiano,* unlike *Boyd,* were not forfeiture cases. They were federal criminal prosecutions. In both cases the Court held that evidence seized in violation of the Fourth Amendment was not admissible notwithstanding the fact that the evidence involved was contraband. By way of dictum, however, since the point was not before it, the Court stated in these [two] cases that its ruling that the contraband was excludable as illegally seized did not mean that the Government was required to return the il-

legally imported narcotics to Jeffers or the unregistered . . . alcohol and mash. . . . Both *Trupiano* and *Jeffers* concerned objects the possession of which, without more, constitutes a crime . . . the nature of the property here . . . is . . . different. There is nothing even remotely criminal in possessing an automobile. It is only the alleged use to which this particular automobile was put that subjects Mr. McGonigle to its possible loss. And it is conceded here that the Commonwealth could not establish an illegal use without using the evidence resulting from the search which is challenged as having been in violation of the Constitution. . . ."

It is therefore the same distinction which we made in our case of *Downs* v. *Porrata, Pros. Atty.*, 76 P.R.R. 572 (1954), following the classical induction which distinguished *malum per se* from *malum prohibitum*: ". . . the nature of an *in rem* or *in personam* proceeding depends for its utility on the aim of the statute. Sometimes an Act, as happens in § 34 of the Weapons Act of Puerto Rico, as amended by Act No. 129 of April 22, 1952 . . . declares certain instruments a public nuisance, which because of their extreme danger to the State, are ministerially forfeited as soon as seized, for possible legal use by the State or for definite destruction. At other times, as in § 37 of the same law, as amended by Act No. 397 of May 10, 1951, it merely provides for the seizure of certain instruments, which although they may be employed for lawful purposes, become unlawful instruments because of the use given to them by the offender. In the first case, [weapon] the confiscation is automatic . . . without taking into consideration any interests other than those of the State. In the second case the confiscation has to be made by judicial declaration after proving (1) the unlawful use of a thing and (2) the knowledge of the interested parties of such unlawful use."

In the commentaries of Byron M. Unkauf of the case of *One 1958 Plymouth Sedan*, XL Tul. L. Rev. 673–674 and

677 (1965–66), it is said: "Statutory forfeitures have rarely been favored in the United States, and, since they are usually considered penal in nature, are strictly construed in favor of the claimant. . . . Almost more important than the application of the exclusionary rule to civil forfeiture actions, was the distinction made by the Court in the noted case [*One 1958 Plymouth Sedan*] with respect to the nature of contraband articles. It was argued that in both *United States v. Jeffers* and *Trupiano v. United States*, there was dicta denying the necessity to return illegally seized contraband even though it was suppressed as evidence in a criminal prosecution. Rejecting this argument, the Court distinguished between articles *malum in se*, the mere possession of which constitutes a crime, and derivative contraband, which acquires its illegality through an illegal use. To return the former would not only subject the claimant to further criminal prosecution, but would frustrate the public policy against the possession of such objects; [on the contrary] possession of property such as the car in the noted case is not *malum in se*, and the return of such property would in no way frustrate public policy."

2—The rights of third innocent parties may only be constitutionally forfeited when the objects are offensive and dangerous in themselves, such as firearms, forged bills, narcotics, alcohols half distilled, and such instruments which without being dangerous in themselves are used by their owners for an unlawful purpose, provided that the confiscation is not so offensive as to become a cruel and unusual punishment. As it may be already understood, the confiscation of all property rights over the thing used in the commission of an offense was the result of an in rem nature of the confiscation proceeding, an absurdity which we inherited from the laws of piracy and the war prizes and from some of the procedural requirements as to notice of unknown parties in the Admiralty Law.

The *Dobbins* case presented the proscription of innocent rights with great simplicity: "Cases arise, undoubtedly, where the judgment of forfeiture necessarily carries with it, and as part of the sentence, a conviction and judgment against the person for the crime committed; and in that state of the pleadings it is clear that the proceeding is one of a criminal character [it should be remembered that the *Dobbins* case was concerned with a distillery and the property on which it was situated, plus the personal property used in connection therewith]; but where the information, as in this case, does not involve the personal conviction of the wrong-doer for the offense charged, the remedy of forfeiture claimed is plainly one of a civil nature; as the conviction of the wrong-doer must be obtained, if at all, in another and wholly independent proceeding."

To this statement in the *Dobbins* case, Mr. Justice Bradley answered in the *Boyd* case: "If the government prosecutor elects to waive an indictment, and to file a civil information against the claimants—that is, civil in form—can he by this device take from the proceeding its criminal aspect and deprive the claimants of their immunities as citizens, and extort from them a production of their private papers, or, as an alternative, a confession of guilt? This can not be. The information, though technically a civil proceeding, is in substance and effect a criminal one. . . . As, therefore, suit for penalties and forfeitures incurred by the commission of offenses against the law, are of this quasi-criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution, and of that portion of the Fifth Amendment which declares that no person shall be compelled in any criminal case to be a witness against himself. . . . Though the proceeding in question is divested of many of the aggravating incidents of actual search and seizure, yet, as before said, it contains their substance and essence, and

effects their substantial purpose. It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure." We have already seen how this proscription of innocent rights makes crisis and disappears from the North American case law. Let us see now what happens in the legislative sphere.

In this same gloss we have shown how the former § 3450 of the Revised Statutes of the United States becomes in 1939 § 2807 and § 3321(a)(b) of the Internal Revenue Code of the United States, and prior to that legislative fact, on October 28, 1919 the National Prohibition Act, generally known as the Volstead Act is enacted. As it is well-known, the Federal Internal Revenue Code, approved February 10, 1939—53 U.S. Stat. at Large 276 (drugs), 293 (firearms), 310 (alcoholic beverages)—attempted to unify in a single piece of legislation the provisions until then spread out in all codes and private laws dealing with the confiscation of lawful objects converted into unlawful objects, because of an unlawful use. With respect to Puerto Rico there still existed § 62 of Act No. 6 of June 20, 1936, which, in the case of alcoholic beverages authorized the confiscation of any vehicle, vessel, launch, or other water or aircraft which is *apprehended* at the time of loading or transporting distilled spirits or alcoholic beverages on which the taxes were not paid and as the only description of the proceeding it ordered its sale at public auction for the benefit of The People of Puerto Rico; there also subsisted § 97 of the same Act No. 6, which copied completely, provided: "Whenever the Treasurer of Puerto Rico is empowered by this Act to sell articles or products attached by him or by his agents, any aggrieved person may appeal to the corresponding district court, and said court shall have jurisdiction, after due hearing to con-

firm, revoke, or modify the decision of the Treasurer. Said appeal shall be made within ten days after the interested person is notified."

When the case of *Stuckert Motors Company* v. *District Court*, 74 P.R.R. 494, 497, 498 is decided on April 7, 1953, a confiscation case under the Weapons Law, this Court, speaking through its Chief Justice Snyder, expressed itself in the following terms: "The trial court pointed out that § 37 is similar in its language to § 26 of the National Prohibition Act. . . .

"Despite the similarity in language between § 26 of the National Prohibition Act and § 37 of our Weapons Law, we do not regard the cases under the former as controlling in the matter before us. In the first place, inasmuch as the Prohibition Act presented many peculiar problems, the cases decided under it frequently are inapplicable in other fields. In the second place, the Federal courts were constantly plagued during the prohibition era with the problem of whether forfeiture of a vehicle should be under the tax laws or under § 26 of the Prohibition Act. This was important as the former did not, as did § 26 [of the National Prohibition Act], protect the interests of innocent lienors or owners. [Citations.] The government therefore usually argued—at times successfully—that no person was apprehended in the act of transporting intoxicating liquor in a vehicle in order to bring the action under the tax laws rather than the Prohibition Act to the prejudice of innocent owners or lienors. But here we have a state statute where no such choice has to be made in the different field of enforcement of the Weapons Law."

On the other hand, when the case of *Downs* v. *Porrata*, 76 P.R.R. 572, 578-9 is decided, this Court calls the attention to the difference existing between objects used for the commission of a crime which are, because of their extreme

danger (*malum in se*), ministerially confiscated, and those which may be used for lawful purposes and the ill use thereof by the wrongdoer (*malum prohibitum*), makes them objects employed in the commission of a crime.

In 1960 Act No. 39 of June 4, 1960 was approved in Puerto Rico, as amended by Act No. 10 of September 1, 1961, known as the Uniform Vehicle, Mount, Vessel, and Plane Seizure Act; amending also § 62 and § 97 of Act No. 6 of June 30, 1936.

Upon examining said Act one realizes that the Federal Internal Revenue Code of February 10, 1939 had for its object to create a system of proceedings for all confiscations as to lawful objects converted into unlawful objects because of its illegal use, such as vehicles, mounts (beast of burden), and sea or aircrafts. See 14-3 *Diario de Sesiones Ordinaria* 1300 (May 18, 1961). As to the proceeding it is not difficult to discover that our Act No. 39 of June 4, 1960 is quite a similar version of the Volstead Act of 1919.

If both of these Acts are read together it will be clear that they both contain the following characteristics: (1) Authority is given to the highest official in charge of applying the Act to seize unlawful objects for some unlawful use; (2) the owners of the property are allowed to substitute the confiscated property for a bond; (3) the owners or lienors are permitted to prove their lack of knowledge of the unlawful use and their innocence as to the criminal act; (4) public auction is obligatory when the property is not claimed by the owner or the lienor.

The profuse jurisprudence on the Volstead Act of 1919 —27 U.S.C.A. § 40, pp. 181–201—shows that one of the purposes of this section was to protect the rights of the owners or possessors or lienors who were innocent in the unlawful use or the commission of the offense.   .

As to the objects which are unlawful by their nature, "and which are not vehicles, mounts, or sea or aircraft

vessels" an appeal to the Superior Court of Puerto Rico is granted only to prove any fact which may render the dangerous objects because of their nature into profitable objects.

3—Attached to the violence of confiscation there is always in most of the cases, an injury to some property privacy or incrimination right. The rule that any lawful property, made into unlawful because of its illegal use, but susceptible to be profitable for lawful purposes, acquired in an illegal manner, in contravention to the constitutional guarantees, cannot make a confiscation valid, is as old as the very institutional law of forfeiture. It is almost a dogma of constitutional law, that property unlawfully acquired cannot be received by the courts to punish a defendant. As has been explained before, the confiscation is nothing more than an additional penalty imposed on the violator. That is the reason why, in each case of confiscation, there is involved an analysis of the evidence of the charge in order to determine the legality thereof. If the evidence is unlawfully acquired, the defendant pleads not guilty, and except in the cases of dangerous objects in themselves, the mere possession of which constitutes an offense, the instruments of the offense should be returned to the violator.

The debate on the reform has run to the years from the *Boyd* case in 1886 to the case of *Mapp* v. *Ohio* in 1961. The belief that the confiscation was directed against the thing without any relation with the personal misbehavior or responsibility of its owner at that moment, as it was said in the *Dobbins* case, initiated the debate. In the *Boyd* case the proposition of the in rem nature of the proceeding was not only resisted, but also the necessity of establishing the owner's responsibility for the criminal act before proceeding to the confiscation of the instrument of the offense, and that said responsibility had to be established by means of evidence which had not been illegally obtained in an illegal

search, or by self-incriminatory coercion. These words were pronounced by Mr. Justice Bradley: "We have already noticed the intimate relation between the two amendments. They throw great light on each other. For the unreasonable searches and seizures condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man in a criminal case to be a witness against himself, which is condemned in the Fifth Amendment, throws light on the question as to what is an unreasonable search and seizure within the meaning of the Fourth Amendment. And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself."

The *Weeks* case followed the same line of thought of the *Boyd* case: "The history of this Amendment is given with particularity in the opinion of Mr. Justice Bradley, speaking for the court in *Boyd* v. *United States,* 116 U.S. 616. As was there shown, it took its origin in the determination of the framers of the Amendments to the Federal Constitution to provide for that instrument a Bill of Rights, securing to the American people, among other things, those safeguards which had grown up in England to protect the people from unreasonable searches and seizures. . . . The maxim that 'every man's house is his castle,' is made a part of our constitutional law in the clauses prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen. . . . The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land."

In the *Weeks* case—an information charging the use of the mail for the purpose of transporting certain coupons or tickets of a lottery—dealt with a federal offense and the new "suffering of the mind" arises between federalists and integralists to which we have already referred. The *Wolf* case of 1948 rings in favor of the federalists and the application of the state provisions in cases of offenses against the different states, and the case of *Mapp* v. *Ohio* is in favor of the integralists and orders the application of the Fourth and Fifth Amendments in cases of federal offenses in federal courts and through the Fourteenth Amendment, the application again of the Fourth and Fifth Amendments in cases of state offenses in state courts. The necessity of this admirable reunion of great reasons of state and discreet criteria of law was explained by the learned Justice Clark in the following words: "There is no war between the Constitution and common sense. Presently, a federal prosecutor may make no use of evidence illegally seized, but a State's attorney across the street may, although he supposedly is operating under the enforceable prohibitions of the same Amendment. Thus the State, by admitting evidence unlawfully seized, serves to encourage disobedience to the Federal Constitution which it is bound to uphold. Moreover, as was said in *Elkins*, 'the very essence of a healthy federalism depends upon the avoidance of needless conflict between state and federal courts.' "

In the case of *One Plymouth Sedan* the debate is settled in its last stages. Maturity of thought which permits the reform has been attained. Following the opinion of Mr. Justice Bradley in the *Boyd* case it is stated: that proceedings instituted for the purpose of declaring the forfeiture of a man's property (in the case at bar, an automobile) by reason of offenses committed by him, though they may be civil in form, are in their nature criminal; that confiscation is but one more penalty among those imposed to punish a

criminal act; a distinction is established between confisca-
tion of dangerous things in themselves, the possession of
which constitutes an offense, and the profitable things which
become unlawful through their illegal use, the former being
destroyed or devoted to a public use and the latter subject
to be claimed for a private licit use; that the state cannot
establish any illegal use with evidence wrongfully obtained,
as would be the case of an automobile confiscated without
probable cause, legally established, or of the search of an
automobile in violation to the provisions of the Constitution;
the argument was rejected as to the technical character of
the confiscation as an in rem proceeding over the thing should
have any effect on the right of the owner of the thing to
present as a defense any violation of his constitutional rights;
that the payment of the fines, costs of the proceedings, stor-
age costs together with the value of the confiscated automo-
bile, seem to be entirely out of proportion to the crime in-
volved, and according to the Constitution, excessive.

The foregoing historical-legislative survey shows clearly
how the concept of the *in rem proceeding* established by the
former judicial interpretation has been destroyed; that the
same concept established in the first federal and Puerto Rican
statutes has been destroyed; the principle of the implied
knowledge of the illegal use by merely delivering or author-
izing the use of the thing has been destroyed; how the concept
on the civil nature of the confiscation on which the case law
used to rely by authorizing the use of evidence illegally ob-
tained in order to execute said confiscation has been de-
stroyed; the new concept of confiscation as a penalty.

Therefore, whenever an object, which may be dedicated to
a lawful use, such as an automobile, is confiscated, there is
the obligation to respect the rights of innocent owners and
lienors of a profitable object, if they do not have any knowl-
edge or participation in the unlawful use of the automobile

by the violator, but it is up to the State to prove said knowledge or participation of the owner or lienor in the unlawful use before retaining the property as part of the penalty imposed, if said penalty should be reasonable. I dissent.